[Civ. No. 5999. Third Appellate District.—April 1, 1938.]

ARTHUR CHAPMAN et al., Appellants, v. TITLE GUARANTEE AND TRUST COMPANY (a Corporation) et al., Respondents.

W. I. Gilbert, Jr., for Appellants.

M. J. Rankin, Seth I. Colver, Milo V. Olson and Walter S. Home for Respondents.

THOMPSON, J.—The plaintiffs have appealed from a judgment quieting title in the defendant, Central Life Assurance Society, to a portion of lot 7 of San Marino tract in Pasadena.

The complaint in this case was filed February 14, 1934, alleging that by the terms of a certain agreement the plaintiff, Arthur Chapman, acquired title to the land in question which he holds in trust for Marion Scott, the owner thereof, to secure the payment of obligations due from her to the grantee. It is further asserted the defendants wrongfully claim title to the land as the result of foreclosure proceedings of a purported deed of trust executed by Marion Scott to secure the payment of a promissory note dated March 2, 1929, for the sum of $6,500. The Title Guarantee & Trust Company is named in the deed as trustee, and the Mortgage Guarantee Company as beneficiary thereof. For a valuable consideration the note and trust deed were subsequently assigned and transferred to Central Life Assurance Society. But the complaint asserts that neither of those instruments was assigned nor executed by Marion Scott, and on the contrary that they were forged and invalid. It is also alleged the plaintiffs were not indebted to the defendants or any of them on account of said note, or at all; that the foreclosure proceedings were therefore void, and that none of the defendants had any right, title or interest in the lot described.

The complaint then asked that title to the property be quieted in the plaintiffs and that the defendants be enjoined from asserting any right thereto and from interfering with plaintiffs' possession thereof.

The defendant, Mortgage Guarantee Company, filed its disclaimer in the action. The Central Life Assurance Society, and the Title Guarantee & Trust Company filed separate answers denying that either the note or trust deed was forged or invalid, and asserting that the plaintiff Marion Scott held the record title to the land and represented that she was the owner thereof, upon which assurance she procured from the Mortgage Guarantee Company a loan of $6,500, and signed and executed the note in question March 2, 1929, payable in semi-annual instalments of $195, together with interest on all deferred payments at the rate of 6 per cent per annum, with the privilege on the part of its holder to declare the entire note due upon default of any payment thereof; that she also at the same time signed and executed the deed of trust on the property in question to secure the payment of the promissory note; that the maker of the note defaulted in the payments of certain instalments thereof, and upon demand, pursuant to the terms thereof the trust deed was foreclosed to satisfy the unpaid balance of the note in the sum of $4,335.61, and the property was sold under the provisions of section 2924 of the Civil Code; that Central Life Assurance Society became the purchaser thereof March 30, 1934; that ever since the last-mentioned date said Central Life Assurance Society has been and now is the owner of the property and entitled to the possession thereof; that the plaintiff, Arthur Chapman, is not the owner of said property, and that he wrongfully withholds possession thereof from the Central Life Assurance Society; that if the said Chapman ever held a conveyance to said property, it was solely in trust for the benefit of O. N. Scott, the former owner thereof. These answering defendants then prayed that title to the property be quieted in the Central Life Assurance Society.

Upon trial the court found that prior to September 29, 1928, O. N. Scott and his wife Belle W. Scott owned the property in question; that on the last-mentioned date they fraudulently deeded the lot to Marion Scott, their daughter, for the purpose of defrauding the defendants; that on March

2, 1929, the plaintiffs conspired with O. N. Scott and his wife and with Edith Marion Scott Packard, the daughter of Mr. and Mrs. Scott to fraudulently procure a loan of $6,500 from the Mortgage Guarantee Company to be used in constructing a dwelling house on said land, by representing that Marion Scott was the real owner thereof, when in truth O. N. Scott and his wife owned the property, and by executing the note for said sum of money secured by the trust deed on said property and after thus securing the loan to then defraud the holder of the note and trust deed by repudiating her execution of those instruments and declaring them to be forged and void; that said scheme and plan was carried out in pursuance of said conspiracy and the Mortgage Guarantee Company, believing that Marion Scott was the real owner of the land and possessed authority to execute a valid trust deed thereon to secure the loan, and relying upon those representations, deposited in a trust fund said sum of $6,500, and paid to the plaintiffs a considerable portion thereof; that on March 2, 1929, pursuant to said scheme and plan to defraud the Mortgage Guarantee Company, Marion Scott, the daughter of Mr. and Mrs. O. N. Scott, executed and delivered as her valid instrument the promissory note for $6,500 and her deed of trust to the property in question to secure the note, conditioned as above stated; that for a valuable consideration the note and trust deed were assigned and transferred to the Central Life Assurance Society, which then became the owner and holder thereof. The court determined that the note and trust deed were not forged or false, but on the contrary that they were both valid and binding as a lien against the land. The court further found that the Mortgage Guarantee Company actually paid, prior to September 10, 1929, on account of said loan the aggregate sum of $4,750 which was expended by the conspirators in constructing the dwelling house on said premises at which time default in the payments of certain instalments which were due on the note occurred, and numerous mechanics' liens were filed against the property; that on October 23, 1933, the owner and holder of the note and trust deed served notice of default thereon, and upon demand the trust deed was foreclosed and on March 2, 1934, the property was sold under the provisions of section 2924 of the Civil Code to Central Life Assurance Society, which thereby became and

now is the owner of the land and that neither Arthur Chapman nor Marion Scott has any right, title or interest in the property. A judgment was accordingly rendered quieting title to the lot in Central Life Assurance Society.

The judgment originally awarded Central Life Assurance Society damages in the sum of $1430 for unlawful detention of the property by plaintiffs. A new trial was granted with respect to that feature of the judgment. No appeal was taken from that order. The motion for new trial was denied with respect to that portion of the judgment which quiets title. From the judgment quieting title the plaintiffs have appealed.

The appellants contend that the findings and judgment are not supported by the evidence, particularly with respect to the issues regarding the alleged conspiracy and affecting the party entitled to the land in question, that the court erred in receiving in evidence the findings and judgment as *res judicata* in certain consolidated mechanics' lien cases involving the same property, and that Central Life Assurance Society was barred, under the provisions of section 408 of the Civil Code, from maintaining its defense to this action, for the reason that it is a foreign corporation engaged in intrastate business in California without having complied with the requirement of section 293 of the Civil Code, by filing in the office of the county clerk of Los Angeles County, where this land is situated, its articles of incorporation.

The Central Life Assurance Society is not barred by statute from maintaining this suit. The court found that it is a foreign corporation. We are pointed to no evidence indicating that it had not fully complied with the provisions of section 405 of the Civil Code by filing with the secretary of state a certified copy of its articles of incorporation. All that appears is that a copy of those articles was not filed in the office of the county clerk of Los Angeles County in accordance with the provisions of section 293 of the Civil Code.

Section 293 of the Civil Code, requiring corporations to file a certified copy of their articles of incorporation in the office of the county clerk of each county wherein they possess real property, has no application to foreign corporations. The only penalty for such failure as provided by that section of the code is that the delinquent corporation may not main-

tain an action "in relation to such real property, its rents, issues or profits". Section 293, however, must be construed in conjunction with section 278 of the same code which specifically declares that the term "corporation" as it is used in part 4, title I, of that code, "unless otherwise expressly provided, refers only to a domestic corporation". Since the Central Life Assurance Society is not a domestic corporation, section 293 of the Civil Code has no application to it.

Nor does article XII, section 4, of the California Constitution broaden the provisions of section 293 of the Civil Code so as to require a foreign corporation to file with the county clerk of the county in which it owns real property, a copy of its articles. That section of the Constitution merely provides:

"The term 'corporations', as used in this article, shall be construed to include all associations and joint-stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships, and all corporations shall have the right to sue and be subject to be sued, in all courts, in like cases as natural persons."

The preceding section of the Constitution authorizes all corporations to sue and to be sued "in like cases as natural persons". The appellants contend that the foregoing construction of sections 278 and 293 of the Civil Code confining their application to domestic corporations is erroneous for the reason that it discriminates in favor of foreign corporations contrary to the provisions of article XII, section 15, of the Constitution which provides that:

"No corporation organized outside the limits of this state shall be allowed to transact business within this state on more favorable conditions than are prescribed by law to similar corporations organized under the laws of this state."

Such discrimination would render section 293 of the Civil Code unconstitutional and void. It is, however, unnecessary to determine the constitutionality of that section of the code for the reason that there is no evidence in this case that the Central Life Assurance Society engaged in "transacting business within this state". The purchase of the note and trust deed which are involved in this suit is the only transaction of which there is any evidence in the record. That single transaction does not constitute the conducting of a business. In construing section 405 of the Civil Code, which

provides that "No foreign corporation shall transact intrastate business in this State until it has filed with the Secretary of State a copy of its articles" it has been uniformly held that a single, isolated transaction does not constitute the carrying on of *intrastate business* within the meaning of the inhibition of the statute. (6A Cal. Jur. 1595, sec. 961; *General Conference of Free Baptists* v. *Berkey,* 156 Cal. 466 [105 Pac. 411] ; *In re Martin,* 132 Cal. App. 64 [22 Pac. (2d) 269].)

Moreover, the appellants waived their right to challenge the omission of the Central Life Assurance Society to file its articles in the office of the county clerk of Los Angeles County, by failing to plead that defense. It is said in 6A California Jurisprudence, page 1377, section 803, in that regard:

"The failure to file a copy of articles in the proper county is a mere matter of abatement, which must be specially pleaded by the other party, otherwise it is waived."

A similarity of the names of a daughter and a sister of O. N. Scott plays an important part in the plot to defeat the $6,500 loan. The plaintiff, Marion Scott Aitken, is a sister of O. N. Scott. She was married to John S. Aitken, who formerly worked for Mr. Scott, long prior to the transfer of the record title of the land in question to Marion Scott, which was September 28, 1928. She was commonly known as Marion Aitken. Mr. Scott knew of their marriage. Mr. and Mrs. Aitken did not reside in the home of the Scotts. Mr. and Mrs. Scott had a daughter who, at the time of the transaction in question, was a young girl named Edith Marion Scott, but commonly called Marion Scott. She resided with her parents during that period of time. She was then a single woman, but later she married Mr. Herbert Packard, Jr. Without doubt it was this daughter in whose name of Marion Scott her father placed the record title of the lot in question for the fraudulent purpose of defeating the loan which he proposed to procure. Unquestionably it was the daughter who within six months thereafter signed and executed the $6,500 note and trust deed. It was the daughter who went before the notary public, Mr. Young, to acknowledge that deed. The evidence leaves no room for any other reasonable conclusion. At the trial when she was asked to write her name of Marion Scott to serve as an exemplar

of her handwriting to compare with the signatures on the challenged note and trust deed, under instructions from her attorney, who is not the present attorney appearing for her on this appeal, she refused to do so. We must assume that she refused to furnish that example of her handwriting because it would impeach her denial that she signed the documents. Another persuasive circumstance indicating that it was the daughter and not the sister of O. N. Scott who was intended to hold the record title, and who executed the note and trust deed, is that both the deed from Mr. and Mrs. Scott to Marion Scott, and the deed of trust from her to Mortgage Guarantee Company, designated her as "a single woman". Her aunt, Mrs. Aitken, was not then a single woman, and Mr. Scott knew that fact. It seems absurd for Mrs. Aitken to claim that she held the title to that lot. She admits that she never received the deed to the land. The deed from Scott and wife to Marion Scott was recorded at the request of the grantee, and returned to the address of the home where the daughter lived with her father and mother. Mrs. Aitken did not live there. It is a conclusive fact that the deed from Mr. Scott was never delivered to Mrs. Aitken. It is equally certain it was not the intention of Scott to convey the land to his sister for any purpose or at all.

The findings and judgment to the effect that the plaintiffs conspired with Mr. and Mrs. O. N. Scott, and their daughter Marion Scott to defraud Mortgage Guarantee Company of its lien on the Pasadena lot to secure the loan of $6,500 procured in the name of Marion Scott, and quieting title to said lot in Central Life Assurance Company are adequately supported by the evidence. Indeed, the record furnishes very conclusive evidence that the plaintiffs conspired and cooperated with Mr. and Mrs. O. N. Scott and their daughter to perpetrate the fraud by which they sought to place the record title of the lot in the confusing and fictitious name of Marion Scott, without the owners thereof actually parting with its title, and then to procure the loan of $6,500 represented by the note and deed of trust executed in the name of the fictitious title owner of the land, after which the note and trust deed would be repudiated as forged and invalid and the lien of the holder thereof would be thus destroyed and the recovery of the loan defeated. That procedure is exactly what they attempted to carry out. It was

a bold and reprehensible plot in which O. N. Scott was the moving spirit.

Among the circumstances appearing in evidence, which, together with the reasonable inferences which may be drawn therefrom in support of the findings and judgment, are the following: O. N. Scott and his wife were owners of the property in question. It was their home. They resided there with their daughter, an unmarried woman, who was commonly known as Marion Scott. Mr. Scott is a brother of the plaintiff, Marion Scott Aitken, who was married to John S. Aitken at the time the transaction which is involved in this case occurred. Her husband formerly worked for Scott in constructing buildings; they previously cooperated in other building transactions conducted in the name of a dummy individual. The Aitkens were not living with the Scotts at the time of this transaction. Mrs. Aitken was not commonly known as Marion Scott, but she was called Marion Aitken. She claimed to have been the Marion Scott to whom the property was deeded, but she knew little about the transaction. She concedes that she never saw the deed. It was not delivered to her. She admits that she did not sign or execute the note or deed of trust. She never saw or heard of them for years after they were executed. She received none of the numerous checks for money paid in the name of Marion Scott to Mr. Scott. Mrs. Aitken claims to have advanced loans to her brother which she asserts became the consideration for his grant of title to her. The evidence of the times and amounts of these loans is unsatisfactory. Her contention in that regard is unreasonable. Her coplaintiff, Arthur Chapman, also worked for O. N. Scott, and cooperated with him in other transactions in the name of a dummy individual.

Mr. Scott wanted to construct a dwelling house on the premises. He personally negotiated the loan. September 28, 1928, Mr. and Mrs. Scott, deeded the property to *"Marion Scott, a single woman"*. April 30, 1929, Mr. and Mrs. Scott executed a quitclaim deed of the property to the same Marion Scott. After Scott had negotiated the loan, his daughter Marion Scott executed, about five months after she received her deed, the note and trust deed dated March 2, 1929. That trust deed also recites that the trustor, Marion Scott, was an unmarried woman. Nearly a month after that trust deed

was executed, Scott went with his daughter to his notary public who took the acknowledgment April 11th, reciting that "Marion Scott, *a single woman,* known to me to be the person whose name is subscribed to the instrument", acknowledged it. She gave her address to the Mortgage Company conforming to the residence of her father. The trust deed was recorded at her request and returned to her at her father's address. The payments of money on the loan were made to her or to her father with her full knowledge and it was expended in constructing the dwelling house on the premises. The checks were either cashed by her or by her father. Mr. Scott also personally made the payments to the beneficiary under the trust deed. Mrs. Aitken knew nothing of the details of that transaction.

Within four months from the time the $6,500 note and trust deed were executed, Marion Scott executed another purported note July 15, 1929, for $10,000 to Belle W. Scott, the wife of O. N. Scott, secured by a second trust deed on the same property, which appears as a junior encumbrance thereon. This trust deed was also acknowledged by Scott's notary public, but does not recite that the trustor was an unmarried woman. The notary had no record of this acknowledgment, and he had no recollection of it. He said the trustor was not present when it was acknowledged. Mrs. Belle W. Scott, the mother of Marion, was named as beneficiary of that trust deed. From the similarity of signatures it appears that this second note and trust deed were signed and executed by Scott's sister, Marion Scott (Aitken). Fifteen days after this purported note and trust deed were executed, Belle W. Scott assumed to transfer the note to the plaintiff, Arthur Chapman, in the following language: "For value received I hereby assign all my right, title and interest to the within note, secured by trust deed, without recourse to me, to Arthur Chapman." No written evidence of the foreclosure of this trust deed appears in the record, but Mrs. Aitken testified that it was foreclosed by Arthur Chapman. The complaint, however, alleges that Chapman took the title as trustee for the trustor, Marion Scott. The evidence of the money consideration for this transaction is very unsatisfactory and clearly smacks of fraud. Numerous conflicts of statements made by the plaintiffs and their

coconspirators appear in the record. These circumstances, and other facts too numerous to recite, together with the reasonable inferences to be drawn therefrom, fully support the findings and judgment of the court.

The plaintiffs claim title to the lot under this purported junior encumbrance transaction. They must recover judgment on the strength of their own title, and not on the weakness of the respondents' title. There is no satisfactory evidence to support their claim of title. For the purpose of this suit it is immaterial whether O. N. Scott actually intended to and did execute his deed of March 2, 1929, to his daughter Marion Scott with the intention of alienating his title to the lot and to thereby convey it to his daughter, whether he merely used her name as a fictitious individual by means of which the conspirators attempted to defraud the creditor and defeat the note and trust deed by pretending they were forged and invalid, or whether he actually conveyed title to his daughter and acted as her agent in the fraudulent transaction. Scott furnished his daughter with the *indicia* of ownership of the lot and the culpable parties are estopped from denying the validity of the $6,500 note and trust deed. O. N. Scott was the active manipulator of the entire transaction. The plaintiffs and Scott's wife and daughter were his willing accessories to the plot. The name of a grantee of property will be deemed to be fictitious, even if it is the name of a living person, provided the parties assume that name for the fraudulent purpose of consummating the particular transfer. (*Overton* v. *Harband,* 6 Cal. App. (2d) 455 [44 Pac. (2d) 484].)

The appellants contend that the court erred in receiving in evidence the record of previous consolidated mechanics' lien foreclosure suits, as *res judicata* of the ownership of the property, which involved the same lot in controversy in this suit. That judgment was rendered in March, 1932. The court there found that "Marion Scott was the name of the *record owner*" of the land, and that "all said labor and materials were furnished at the request of O. N. Scott, and with the knowledge of [his daughter] Marion Scott, who is now the wife of Herbert Packard, Jr." This respondent, Central Life Assurance Society, was not a party to those consolidated suits. The defendants in this

suit, Title Guarantee & Trust Company and Mortgage Guarantee Company were also parties defendant in those consolidated mechanics' lien cases. Those actions were dismissed as to the last two named defendants. C. A. Schoch was also a party plaintiff in those cases. He recovered judgment which was subsequently assigned to Central Life Assurance Society. We are, however, of the opinion that judgment is not *res judicata* with respect to the ownership of the land so as to become controlling in this suit, for the reason that the Central Life Assurance Society was not a party to those consolidated mechanics' lien cases. It follows that the record of those cases was improperly received in evidence in this case. However that ruling is harmless. It constituted only cumulative evidence of that fact which satisfactorily appears from an abundance of other evidence adduced at the trial. It was not prejudicial under the circumstances of this case. Moreover, it does not appear there is a miscarriage of justice. The findings and judgment are eminently proper and in accordance with justice. Under article VI, section 4½, of the Constitution that ruling does not constitute reversible error.

The judgment is affirmed.

Pullen, P. J., and Plummer, J., concurred.