[L. A. No. 21917. In Bank. Aug. 10, 1951.]

DOROTHY L. HOCKING, Appellant, v. TITLE INSURANCE AND TRUST COMPANY (a Corporation) et al., Respondents.

Wing, Wing & Brown and Merrill Brown for Appellant.

Lawrence L. Otis, Gilbert E. Harris, James F. Healey, Jr., and Sarau, Adams, Neblett & Sarau for Respondents.

SCHAUER, J.—Plaintiff, in reliance on a policy of title insurance, seeks to recover from defendant title insurance companies for damages she claims to have sustained by reason of what is asserted to be a defect in the title to certain land purchased by her in the city of Palm Springs, county of Riverside.     Judgment on the pleadings was rendered in defendants' favor, and plaintiff appeals. The issue presented is whether plaintiff's complaint states a cause of action (see *Union Flower Market, Ltd.* v. *Southern California Flower Market, Inc.* (1938), 10 Cal.2d 671, 673 [76 P.2d 503] ; *Seeger* v. *Odel* (1941), 18 Cal.2d 409, 412 [115 P.2d 977] ). We have concluded that the judgment must be affirmed.

    Plaintiff alleges: She purchased for the sum of $13,-550 two unimproved lots in a subdivision in Palm Springs

and received a grant deed therefor. Approximately one month later plaintiff purchased from defendants a policy of title insurance insuring her in a sum not in excess of her purchase price of $13,550 against loss or damage which she might sustain (1) by reason of title to the lots not being vested in plaintiff in fee simple, (2) by reason of unmarketability of plaintiff's title, (3) by reason of any defect, lien or encumbrance on such title. The lots are described in the policy as "Lots 5 and 10 of VISTA DEL CIELO No. 3, as shown by Map on file in Book 21 page 55 of Maps, records of Riverside County, California." The policy contains a provision setting forth certain exceptions to its coverage.[1] However, plaintiff did not (she alleges) have a "title as insured by defendants" in that the City Council of Palm Springs, in violation of a city ordinance numbered 39[2] "purportedly approved and accepted"

[1] Such provision reads as follows:

"The Company does not, by this policy, insure against loss by reason of:
1. Easements or liens which are not shown by the public records (a) of the District Court of the Federal District (b) of the county, or (c) of the city, in which said land or any part thereof is situated;
2. Rights or claims of persons in possession of said land which are not shown by those public records which impart constructive notice;
3. Any facts, rights, interests, or claims which are not shown by those public records which impart constructive notice, but which could be ascertained by an inspection of said land, or by making inquiry of persons in possession thereof, or by a correct survey;
4. Mining claims, reservations in patents, water rights, claims or title to water;
5. Any governmental acts or regulations restricting, regulating, or prohibiting the occupancy or use of said land or any building or structure thereon."

[2] Sections 9 and 10 of the ordinance, as pleaded by plaintiff, read as follows:

" (9) STREET IMPROVEMENTS.
The subdivider will be required to improve or to agree to improve the land dedicated for streets, highways and public ways. Such improvements shall include the grading of all such rights-of-way to a sufficient standard that all portions of the subdivision are easily accessible by motor vehicle traffic and all streets and highways shall be treated with a permanent pavement of standard type of a width not less than 20 feet. . . .

" (10) POSTING OF BONDS.
If the improvement work above referred to be not completed satisfactorily, the owner or owners of the subdivision will be required, before the acceptance of the final map, to enter into an agreement with the City Council whereby in consideration of the acceptance by the City Council of the highways offered for dedication the owner agrees to furnish the equipment and materials necessary, and to complete the work specified in the agreement. To assure the City that this work will be com-

by "Resolution No. 1970" a subdivision map of the property involved "without first obtaining from owners of said subdivision" agreements and bonds providing for the grading and paving of the streets in the subdivision, as required by the ordinance; the county recorder of the county of Riverside, in violation of the terms of the Subdivision Map Act (Bus. & Prof. Code, div. 4, pt. 2, ch. 2) and in particular of section 11626[3] of the Business and Professions Code, "purportedly accepted, recorded and filed" the subdivision map of record. The land in the subdivision "is now and has always been open, barren desert land and not improved as set forth in Section 9" of the city ordinance relied upon by plaintiff; the city refuses to issue building permits "in said purported subdivision" by reason of the failure to comply with such ordinance; "it would cost" plaintiff in excess of $13,550 "to make the improvements required" by the city ordinance.

Plaintiff contends that "by virtue of the absence of the bond supported agreement to grade and pave the streets" she does not have a fee simple title in Palm Springs "subdivision lots," that "whatever title she does have is defective by reason of the absence of the bond supported agreement," and that defendants are consequently liable to her under the terms of the title insurance policy. In this connection she points out that "Street improvements obviously enhance the value of subdivision lots," that "obviously the sales value of such property is a long ways from the sum of $13,550.00 which she paid for the property, if it has any value at all," and that "Certainly no one would pay that price for two small areas of vacant, unimproved desert land." She expressly disclaims any contention that the refusal of the city to issue building permits constituted a breach of the title policy,[4] but does state in the petition for hearing by this court that her "infor-

---

pleted, two bonds must be furnished, one in a sum equal to the cost of the work estimated by the City Planning Commission and the other a bond for the security of the material, men and labor in a sum equal to one-half of the estimated costs. The bonds must be furnished by a surety company, approved by the City Council and filed with the City Clerk."

[3]Section 11626 provides: "Except as provided in Section 11537 [not here material], no final map of a subdivision shall be accepted by the county recorder for record unless there has been a compliance with all provisions of this chapter and of any local ordinance.

"The recorder may have not more than 10 days to examine the final map before accepting or refusing it for recordation."

[4]Such refusal would appear to fall within the fifth exception to the policy, quoted in footnote 1.

mation concerning the actions of the City Council and the County Recorder was obtained after the issuance of the policy and resulting from the information of the City that it would refuse and had refused any building permits in the subdivision by reason of the absence of the bond supported agreement to grade and pave the streets.''

Plaintiff relies upon the rule of construction of title policies set forth in *National H. Co.* v. *Title I. & T. Co.* (1941), 45 Cal.App.2d 215, 220-221 [113 P.2d 906], quoting from *Coast Mutual Building-Loan Assn.* v. *Security Title Ins. & Guar. Co.* (1936), 14 Cal.App.2d 225, 229 [57 P.2d 1392], as follows: ''Not only the provisions of the policy as a whole, but also the exceptions to the liability of the insurer, must be construed so as to give the insured the protection which he reasonably had a right to expect, and to that end doubts, ambiguities, and uncertainties arising out of the language used in the policy must be resolved in his favor.

'' 'The courts have also announced a rule . . . to the effect that when the language employed in an insurance contract is ambiguous, or when a doubt arises in respect to the application, exceptions to, or limitations of, liability thereunder, they should be interpreted most favorably to the insured, . . . Such contracts are to be interpreted in the light of the fact that they are drawn by the insurer, and are rarely understood by the insured, to whom every rational indulgence should be given, and in whose favor the policy should be liberally construed. Where the language and terms of a policy are framed and formulated by the insurer, every ambiguity and uncertainty therein should be resolved in favor of the insured.' (14 Cal.Jur. p. 445.)

''The rule thus stated is supported by an unbroken line of authorities, a few of which are the following: [Authorities cited.]''

Plaintiff also cites the statement appearing in *Smith* v. *Bank of America etc. Assn.* (1936), 14 Cal.App.2d 78, 85 [57 P.2d 1363], quoting from *Skelly Oil Co.* v. *Kelly* (1931), 134 Kan. 176 [5 P.2d 823, 824], that ''The word title has a variety of meanings. It sometimes connotes the means by which property in land is established, as in the expression 'chain of title.' It sometimes means 'property' or 'ownership' in the sense of the interest one has in land. A common meaning is complete ownership, in the sense of all the rights, privileges, powers and immunities an owner may have with respect to land.''

In *Sheehy* v. *Miles* (1892), 93 Cal. 288, 292 [28 P. 1046], the following appears: "In the case of *Turner* v. *McDonald,* 76 Cal. 177 [18 P. 262, 9 Am.St.Rep. 189], this court said: 'A perfect title must be one that is good and valid beyond all reasonable doubt'; and in that case it was conceded by counsel upon both sides that a title, to be good, 'should be free from litigation, palpable defects, and grave doubts, should consist of both legal and equitable titles, and should be fairly deducible of record.' It would seem, in fairness to the vendee, that the foregoing requirements should be held absolutely necessary, in order to fully satisfy the covenant of perfect title. Certainly such a condition of title must exist before it can be said to be good and valid beyond reasonable doubt. [Citations.]"

Other definitions of title are: "The words 'good title' import that the owner has the title, legal and equitable, to all the land, and the words 'defective title' mean that the party claiming to own has not the whole title, but some other person has title to a part or portion of the land." (*Copertini* v. *Oppermann* (1888), 76 Cal. 181, 186 [18 P. 256]; *Bates* v. *Howard* (1894), 105 Cal. 173, 184 [38 P. 715].) "A person who has contracted to purchase real estate is entitled to a perfect title; and if the estate or interest of the vendor is subject to defeasance upon the happening of a contingent event or the nonperformance of a condition, the title tendered is not perfect or 'marketable.' Hence, where the vendor brings suit for specific performance, the purchaser may successfully defend the action upon the ground that the estate of the complainant is contingent or defeasible." (22 Cal.Jur. 818, § 22, Remainders and Reversions.) "A seller frequently agrees to furnish a 'good and perfect title.' Such an agreement imports a title that must not only be good in point of fact, but it must also be apparently perfect when exhibited—that is, free from reasonable objection, such as litigation, palpable defects and grave doubts fairly deducible of record, and unencumbered." (7 Cal.Jur. 751-752, § 31, Covenants; see, also, 25 Cal.Jur. 626-629, § 125, Vendor and Purchaser.)

"Much learning has been expended in giving definitions as to good and marketable titles. The following appears to be one supported by the weight of authority, to wit: 'A marketable title, to which the vendee in a contract for the sale of land is entitled, means a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of

650

that prudence which business men ordinarily bring to bear on such transactions, be willing and ought to accept.' [Citations.]" (*Staton* v. *Buster* (1926), 79 Cal.App. 428, 432 [249 P. 878], holding wife's signature to deed to community real property acquired prior to 1917, in addition to that of husband, not required to convey good and marketable title to such community realty; see also *Mertens* v. *Berendsen* (1931), 213 Cal. 111 [1 P.2d 440].)

In reliance upon the general principle that "All applicable laws in existence when an agreement is made necessarily enter into it and form a part of it as fully as if they were expressly referred to and incorporated in its terms" (4 Cal.Jur. 10-Yr. Supp. 138, § 186, and cases there cited; see also *Lelande* v. *Lowery* (1945), 26 Cal.2d 224, 226 [157 P.2d 639]), and upon the further statement that "It is the general rule that applicable municipal ordinances are 'law' within the rule that every contract is made with reference to, subject to, and presumably in contemplation of, existing law" (110 A.L.R. 1048), plaintiff urges that Palm Springs ordinance No. 39 was a part of the contract of title insurance issued to her by defendant, and that violation by the city council of such ordinance and violation by the county recorder of the Subdivision Map Act, constituted a breach of the title policy. She further contends (apparently because the policy describes the lots by reference to the recorded subdivision map) that by the terms of the policy she was assured of a perfect title to "subdivision lots."

It is established law in this state that the title to such a lot embraces an easement to use all of the streets disclosed on the subdivision map. (*Danielson* v. *Sykes* (1910), 157 Cal. 686, 689 [109 P. 87].) Since, says plaintiff, "the Palm Springs subdivision ordinance required these easements to be in a certain condition, namely, graded and paved" and "As such conditions did not exist in this matter," plaintiff's title is not perfect. With respect to the statement in *Smith* v. *Bank of America etc. Assn.* (1936), *supra*, 14 Cal.App.2d 78, 85, that "A common meaning [of the word title] is complete ownership, in the sense of all the rights, privileges, powers and immunities an owner may have with respect to land," plaintiff further urges that "an owner of a subdivided lot in the City of Palm Springs would regard among his 'rights and privileges' with respect to his lot the graded and paved streets." She argues additionally that such a Palm Springs lot owner has an " 'immunity' of significance and value, for if the streets are not improved the city can improve them and charge him a

proportion of the price of the improvement by virtue of the various improvement acts contained in the Streets and Highways Code . . .''

Plaintiff also contends that the acceptance and recording of the subdivision map in violation of existing law ''results in the entire subdivision being in a litigious state as the same is either wholly void or voidable,'' and she is deprived of a record title. She admits inability to find a case in point, but urges that the provisions of section 11626 of the Business and Professions Code, allegedly violated by the county recorder, are mandatory, and that the Subdivision Map Act is for the protection of the public. (See *Smith* v. *Bach* (1920), 183 Cal. 259, 262 [191 P. 14].) She therefore urges application of the general rule stated in 50 American Jurisprudence 43, 44, section 20, as follows: ''There are numerous instances of instruments or proceedings held to be void because of the failure to comply with a statutory provision relating thereto. This is true of mandatory provisions, compliance with which is a condition precedent to the privilege conferred. In fact, a mandatory provision in a statute has been defined as one the omission to follow which renders the proceeding to which it relates illegal and void.''

■ It is defendants' position that plaintiff confuses title with physical condition of the property she purchased and of the adjacent streets, and that ''One can hold perfect title to land that is valueless; one can have marketable title to land while the land itself is unmarketable.'' The truth of this proposition would appear elementary. ■ It appears to be the condition of her *land* in respect to improvements related thereto (graded and paved streets), rather than the condition of her *title* to the land, which is different from what she expected to get. Defendants also point out that under the provisions of section 11628[5] of the Business and Professions Code acceptance of the subdivision map by the recorder constituted such map a public record, reference to which in plaintiff's deed furnished her with a good record title, a title which is legally marketable whether or not a purchaser is available.

■ Concerning the rule of construction making applicable laws part of a contract, defendants rely upon the statement

---

[5]Section 11628 provides: ''When any final map is presented to the county recorder and is accepted by him, he shall so certify on the face thereof and shall fasten the same securely in a book of maps of subdivisions or of cities and towns which he shall keep in his office. Upon acceptance by the recorder, the final map shall be a public record.''

in *Wing* v. *Forest Lawn Cemetery Assn.* (1940), 15 Cal.2d 472, 476 [101 P.2d 1099], that ''This rule, however, should be limited to those laws which are 'applicable' and which affect 'the validity, construction, discharge or enforcement of the contract,' [citations] and care should be taken that its application is not extended to lengths which approach absurdity.'' It is defendants' argument that Palm Springs ordinance No. 39 simply prescribed certain requirements which were to be met before the city council accepted a subdivision map, and did not purport to affect the title to the lots therein plotted, and, further, such ordinance did not affect the ''validity, discharge or enforcement'' of the title insurance contract. We are persuaded that defendants' position is well taken. Not only do the ordinance provisions pleaded and relied on by plaintiff fail to suggest an intention to affect either land titles or title insurance contracts, but plaintiff has cited no authority and we are aware of none which would extend the rule of construction upon which she relies to import an undertaking (other than an express one) by the contracting parties that, prior to the making of the contract, other persons (here, the subdivider and the city council) had complied with all laws which might have a bearing upon the value of the land (here, as affected by the physical condition of adjacent streets), the title to which is the subject matter of the contract.

Although it is unfortunate that plaintiff has been unable to use her lots for the building purposes she contemplated, it is our view that the facts which she pleads do not affect the marketability of her *title* to the land, but merely impair the market *value* of the property. She appears to possess fee simple title to the property for whatever it may be worth; if she has been damaged by false representations in respect to the condition and value of the land her remedy would seem to be against others than the insurers of the title she acquired. It follows that plaintiff has failed to state a cause of action under the title policy.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The issue here presented is whether a title insurance company is liable for a defective title which it has insured. The majority opinion holds that it is not, proceeding upon the premise that plaintiff obtained a merchantable title, and losing

*only,* it is said, substantially the entire value of the property. That is to say, the basic theory of the majority is, that the defect ran to the value of the property rather than the title. This is a misconception of the legal problem involved herein.

The facts are clear: Plaintiff purchased the property and received a grant deed therefor, describing it as two numbered lots in a certain block according to a subdivision map purportedly on record. The subdivider had failed, however, to comply with the city ordinances dealing with subdividing land and the state Subdivision Map Act. (Bus. & Prof. Code, § 11500 et seq.)

I believe the majority opinion is erroneous from any angle of approach. The defect goes to the merchantability of the title whether we look at its effect on the value of the property, or technically, at the title. It is conceded that the title insurance policy guarantees the title to be merchantable.

From the technical standpoint of title, the Subdivision Map Act must be examined. Thereunder, title to easements in streets do not pass until the map of the subdivision is "duly recorded." (Bus. & Prof. Code, § 11615.) No map may be recorded until compliance has been had with *all* the provisions of the act and local ordinances. (*Id.,* § 11626.) It may be said, therefore, that there is at least a grave doubt that the streets were ever dedicated to the public or that plaintiff, as an abutting owner, obtained a private easement therein. But the conveyance of the property to plaintiff was made according to a map which showed streets, and hence her title on its face, would seem to embrace them as an appurtenance. (See *Owsley* v. *Hamner,* 36 Cal.2d 710 [227 P.2d 263].) And defendant by insuring the marketability of his title thereby guaranteed also the title to at least a private easement in the streets. Moreover, it was of importance to his title that the title to an easement for the streets be dedicated to and accepted by the city, for without it he could not compel a dedication or acceptance. Certainly, if title is conveyed which shows frontage on a public street, it is defective if there is no public street, or the existence thereof is gravely doubtful, and it has been so held. (*Cleveland* v. *Bergen Bldg. & Imp. Co.* (N.J.), 55 A. 117; *Morris* v. *Avondale Heights Co.,* 218 Ky. 356, [291 S.W. 752].) It has been held that *deprivation* of an easement that was supposed to be appurtenant to the property conveyed is a defect in the title to the property making it nonmerchantable. (*Monogram Dev. Co.* v. *Natben Const. Co.,* 253 N.Y. 320 [171 N.E. 390].)

Mention has been made in the foregoing discussion of the existence of at least grave doubt as to the quality of the title with respect to the easements public and private. That is all that is required to render a title unmarketable. The rule is stated in *Mertens* v. *Berendsen,* 213 Cal. 111, 113 [1 P.2d 440]: " . . . a marketable title has been defined generally as one *free from reasonable doubt.* . . . 'Such a title must be free from reasonable doubt, and such that a reasonably prudent person, with full knowledge of the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept. It must be so far free from defects as to enable the holder, not only to retain the land, but possess it in peace, and, if he wishes to sell it, to be reasonably sure that *no flaw or doubt will arise to disturb its market value . . .'"* (Italics added.) The holdings of the case are thus summarized: "Title to land has been defined as the means whereby an owner has the just possession of his property. A good or perfect title, within the meaning of contracts for the sale of real property, is one which is free from litigation, palpable defects and grave doubts, which consists of both legal and equitable titles and is fairly deducible from the record. Such a title is one which is not only good in point of fact but which, when exhibited, is free from any reasonable objection. One contracting for such a title may demand a conveyance with such proof of title as will arm him with the recorded means of vindicating its validity in after times—a good or perfect record title. He is not required to accept a title depending upon matters which rest in parol, such as one which can be shown to be good as the result of an action instituted for the purpose of reforming defects existing in any deed which is necessary to make the chain of title complete, or one which rests upon the statute of limitations. Nor is he required to rely upon an oral statement of the vendor as to the state of his title. If there should appear to be such an uncertainty about the title arising from the record as to affect its market value, a court of equity will not compel its acceptance, and the vendee may recover the purchase money paid by him.

"*Marketable title.*—A marketable title to real property is one in which there is no doubt involved, either as a matter of law or of fact—in other words, a good and perfect title, one free from reasonable doubt or pending litigation." (25 Cal.Jur. 628.) Here there is more than a reasonable doubt

whether plaintiff has any easement in the street and whether the city has any interest or obligation in the street. Indeed the doubt has become a certainty because the city has refused permission to use the property at all for building, all of which springs from the defect in the title, consisting of the subdivider failing to comply with the law, a prerequisite to a clear chain of title where land is subdivided. It was the defendant's business and responsibility to ascertain whether there had been obedience to the law in perfecting the subdivision.

In addition to the foregoing, in connection with the refusal of the city to issue a permit for the erection of a building on the property, such refusal plainly renders the property practically worthless. Obviously that is a defect in the title. It is something of record which renders the property valueless. It is of more serious consequence than a restrictive covenant which prohibits certain uses of the property.

It is suggested in opposition to the foregoing discussion that the policy of insurance excepts from the coverage any governmental regulation restricting the use of the land. Clearly, that has no application to the title to the easement as affected by subdivision map laws, for the title to the property is involved, and it is a regulation as to how titles might be acquired. If the law required a witness' signature to a deed to validate it, noncompliance therewith would not permit the insurer to invoke the exception. Its business is to insure against imperfections in instruments in the chain of title. Here the map must meet certain requirements, as does a deed, and is, in effect, an instrument in the chain of title, a defect in which must be found by the insurer as a part of the risk assumed by it. *Here it was not anything that was done or not done by the city that caused the imperfection in the title.* The *subdivider,* by failing to follow the law caused the title to be in doubt, the same as if a grantor had given a void deed. The action of the city in denying the permit is merely one of the incidents flowing from the faulty title. Strictly construing the policy against the insurer, as we must, the exception can only embrace things, such as zoning regulations, which are no part of the chain of title and have no effect upon it. As above seen, the map requirements are, on the other hand, the same as deed requirements, that is, for land to be conveyed in parcels, certain procedure must be followed and certain documents must be executed and recorded. Moreover, it should be noted that the exception in the policy concerns itself solely with the *use or occupancy* of the property. The map regula-

tions, however, deal with the right to *convey* and it is obvious that plaintiff did not get a clear title to the property by the conveyance in question.

I would therefore reverse the judgment.

Appellant's petition for a rehearing was denied September 7, 1951. Carter, J., voted for a rehearing.