[No. B152466. Second Dist., Div. One. Dec. 23, 2002.]

MORTGAGE ASSOCIATES, INC., Plaintiff and Appellant, v.
FIDELITY AND DEPOSIT COMPANY OF MARYLAND et al.,
Defendants and Respondents.

**COUNSEL**

Ruben & Jones, Steven J. Ruben, Peter M. Kunstler and Ronald W. Makarem for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, Michael R. Davisson, Hall R. Marston; Stephen E. Anderson and Mark E. Schiffman for Defendants and Respondents.

**OPINION**

**VOGEL (MIRIAM A.), J.**—As the result of a fraudulent scheme perpetrated by a mortgage lender's employees and third persons, the mortgage lender made several loans for more than the value of the mortgaged properties. The mortgage lender, unable to recoup its losses through foreclosure, submitted claims under its financial institution bond (which covered some but not all losses resulting from employee dishonesty) and under 16 title insurance policies it had purchased for the mortgaged properties. Both insurers denied the claims, and both were sued by the mortgage lender. The insurers' motions for summary judgment were granted, and the mortgage lender now appeals. We affirm both judgments.

FACTS

A.

Mortgage Associates, Inc. (MAI), a mortgage banking company, was in the business of making purchase money mortgage loans on real property. Most of MAI's business came from either loan brokers or real estate investors who had purchased foreclosure properties for resale at a profit and who referred their buyers to MAI. As relevant to this case, MAI had two types of insurance: (1) a financial institution bond issued by Fidelity and Deposit Company of Maryland (F&D) to cover losses resulting from employee dishonesty, and (2) title insurance policies purchased for each property from Fidelity National Title Insurance Company (Fidelity).

MAI sent every loan application to its underwriting department for an analysis of the borrower's credit and income history, and an appraisal of the property. If the analysis supported a loan under MAI's underwriting guidelines, the underwriting department would approve the loan and arrange funding through one of two lines of credit maintained by MAI at two banks.

After the loan was funded, MAI would sell the loan on the secondary market and use the proceeds to pay back the banks.

### B.

Sometime around June 1999, MAI discovered a "disturbing" pattern of "first-payment" defaults on loans originated by Ed and Dan Guinto, the principals of Pacific American Equities, an ostensible real estate investment company. MAI investigated and concluded that the Guintos had perpetrated a fraudulent real estate scheme by purchasing 16 or more properties below market value, setting up sham sales to "straw buyers" at inflated prices, and fabricating loan packages with appraisals that appeared to justify the purchase prices. The unsuspecting "buyers" (such as the Guintos' maintenance man) unknowingly became the purchasers and titleholders, and thus did not know about (and did not repay) the mortgage loans, the proceeds of which were paid to the Guintos as the sellers.

MAI concluded that two of its employees, loan underwriters Hermine Pili and William Raymond, were knowing participants in the Guintos' scheme, and MAI "believed" that Pili and Raymond had received "significant financial benefits" as payment for their participation because (according to MAI's thinking) they would not otherwise have jeopardized their positions, and because they quit their jobs shortly after MAI began its investigation—but MAI has never put a dollar amount on the financial benefit purportedly received by Pili and Raymond. MAI eventually obtained title to the properties in foreclosure but it lost money on the transactions because the properties had been so grossly overvalued.

### C.

MAI reported its losses to both insurers, F&D and Fidelity. Both insurers denied the claims, and both were then sued by MAI in this action for damages for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. Both insurers answered, and both later moved (separately and on the different grounds discussed below) for summary judgment. Both motions for summary judgment were granted, and MAI now appeals.

### I.

*The Judgment in Favor of F&D*

MAI contends F&D's motion for summary judgment should have been denied. We disagree.

A.

The financial institution bond issued by F&D to MAI included the following provisions:

"[F&D], in consideration of an agreed premium, and in reliance upon all statements made and information furnished to [F&D] by [MAI] in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify [MAI] for:

"INSURING AGREEMENTS

"FIDELITY

"(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

"Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

"(a) to cause [MAI] to sustain such loss; and

"(b) to obtain financial benefit for the Employee or another person or entity.

"However, if some or all of [MAI's] loss results directly or indirectly from Loans, that portion of the loss is not covered *unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.*" (Italics added.)

B.

The quoted coverage provisions, including the financial benefit requirement, were the product of negotiation between the banking industry and fidelity bond insurers and were carefully crafted to define the scope of the intended coverage. (*F.D.I.C. v. Insurance Co. of North America* (1st Cir.

1997) 105 F.3d 778, 786; Armentrout & Price, *Financial Benefit Requirement* (2002) <www.manierherod.com/articles/finbenefitrequire.pdf> [as of Dec. 23, 2002], p. 4, hereafter Armentrout & Price.)[1] The financial benefit requirement is "an essential part of these coverage provisions as it narrows coverage to loss incurred by the insured as a result of acts by an employee which are motivated by personal financial gain for the employee or an intended third party and not by an intent to benefit the employer (whether exclusive of or conjunctive with an intent for collateral benefit to the employee)." (*Id.*)

■ "The financial benefit requirement protects the insurer from claims where the employee's motivation is either undeterminable or intangible. The employee must, instead, have acted dishonestly with the intent or motivation to receive financial gain for himself or for some third party. It is this additional financial motivation which implicates coverage under the employee dishonesty coverage provisions. Not only does the financial benefit requirement limit coverage to that intended under the policy or bond, it also helps to focus coverage on truly dishonest conduct and not conduct which is merely improper, negligent, or incompetent. An employee [who] causes his employer to incur a loss without receipt of any financial benefit rarely acts with the intent or malice which is implicit in the employee dishonesty coverage." (Armentrout & Price, *supra,* at p. 4.) "The financial institution bond is not intended to guarantee against bad loans made by the insured. . . . The $2,500 minimum excludes claims where a loan officer received a small gift which is less likely to motivate the employee to make a fraudulent loan." (*Id.* at p. 9.)

## C.

■ In support of its motion for summary judgment, F&D presented MAI's factually devoid discovery responses to establish that MAI had no evidence to support its claim that Pili and Raymond had received a financial benefit of $2,500 or more. MAI did not dispute that fact in the trial court, and it does not dispute it here. Instead, MAI contends the financial benefit requirement is an exclusion rather than a limitation on coverage, and that the burden was on F&D to prove that Pili and Raymond received *less than* $2,500. In MAI's view, its claim was sufficient because it presented facts "indicating" that Pili and Raymond "had received a financial benefit to participate in the Guinto scheme," and the "burden then shifted to F&D to

---

[1]The cited article, *Financial Benefit Requirement (Including Discussion of Employee Salary, Commissions and Fees Exclusion)*, was presented to the American Bar Association (Fidelity and Surety Law Committee) at its 2002 midwinter meeting.

demonstrate that MAI's claims were specifically excluded." Why? Because the insuring language uses the word "however" in the sentence identifying the financial benefit requirement. ██ ▬ ██ ██ No authority is cited for this novel proposition and we know of none.[2]

The financial benefit requirement is plainly part of the insuring agreement, and we see no ambiguity in the language of the bond. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253] [policy terms must be read in their ordinary and popular sense]; *Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348, 1359 [270 Cal.Rptr. 779]; *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386 [131 Cal.Rptr. 42, 551 P.2d 362] [the plain language of a limitation on coverage must be respected].) F&D clearly limited the extent of coverage, and it was MAI's burden to prove that its claim came within the coverage provisions of the bond. (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1453 [75 Cal.Rptr.2d 54]; *Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 47 [261 Cal.Rptr. 273]; see also *First Dakota Nat. v. St. Paul Fire & Marine Ins.* (8th Cir. 1993) 2 F.3d 801, 810.)

F&D's motion for summary judgment showed the weakness in MAI's case (which the summary judgment statute permitted at the times relevant to this appeal), and MAI was unable to respond with evidence creating a triable issue of material fact. (Former Code Civ. Proc., § 437c, subd. (o)(2); Stats. 1992, ch. 1348, § 1, p. 6703; Stats. 1993, ch. 276, § 1, p. 1973; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580-593 [37 Cal.Rptr.2d 653].) Generously construed, MAI's "circumstantial evidence" of the benefit received by Pili and Raymond—that they would not have acted as they did had they not received a significant benefit, and that they quit their employment when MAI began its investigation—tends to show that Pili and Raymond acted wrongfully, but nothing in that evidence comes close to establishing the value of the benefit they received or whether it exceeded $2,500. (*Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1298-1299 [123

---

[2]We of course agree that the burden is on an insurer to prove that a claim is specifically excluded. The notion we summarily reject is MAI's unsupported assertion that the use of "however" in an insuring clause transforms insuring language into an exclusion. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1191 [77 Cal.Rptr.2d 537, 959 P.2d 1213] [in a commercial general liability insurance policy, the insured has the burden of proof to establish the sudden and accidental exception to a policy that does not otherwise extend coverage for pollution]; *FDIC v. New Hampshire Ins. Co.* (9th Cir. 1991) 953 F.2d 478, 483-485 [the insured has the burden to prove discovery within a policy's applicable period of limitations].)

Cal.Rptr.2d 924] [inferences based on speculation, conjecture or guesswork will not defeat summary judgment].) F&D's motion was properly granted.[3]

## II.

### *The Judgment in Favor of Fidelity*

■ MAI contends Fidelity's motion for summary judgment should have been denied. We disagree.

### A.

The 16 title insurance policies issued by Fidelity to MAI covered losses caused by defects in title (*Karl v. Commonwealth Land Title Ins. Co.* (1993) 20 Cal.App.4th 972, 978 [24 Cal.Rptr.2d 912]), and included the following language:

"SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIDELITY NATIONAL TITLE INSURANCE COMPANY . . . insures . . . against loss or damage . . . *sustained or incurred by the insured by reason of*:

"1.   Title to the estate or interest described in Schedule A being vested other than as stated therein;

"2.   Any defect in or lien or encumbrance on the title;

"3.   Unmarketability of the title; [¶] . . . [¶]

"5.   The invalidity or unenforceability of the lien of the insured mortgage upon the title; [¶] . . . [¶]

"9.   The invalidity or unenforceability of any assignment of the insured mortgage; . . ." (Italics added.)

---

[3]Our resolution of the coverage issue in favor of F&D makes it unnecessary to consider MAI's arguments about its claim for breach of the covenant of good faith and fair dealing or its demand for punitive damages. (*Horsemen's Benevolent & Protective Assn. v. Insurance Co. of North America* (1990) 222 Cal.App.3d 816, 822 [271 Cal.Rptr. 838]; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1286 [31 Cal.Rptr.2d 433].) In this regard, we note that an issue addressed in the trial court—whether F&D's bond covered certain losses caused by third parties—was abandoned by MAI's failure to address it in its opening brief, and its discussion in its reply brief comes too late. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

## B.

Fidelity moved for summary judgment on the ground (among others) that its policies provided coverage for a loss caused by a defect in title, not for MAI's losses sustained as a result of fraud, and the motion was granted on that ground.[4] MAI's argument, although not altogether clear, seems to be that the mere existence of fraud in the current chain of title is a "defect in title" affecting the marketability of the properties and triggering coverage under Fidelity's policies. We reject MAI's argument, agree with Fidelity that MAI's losses were not caused by a defect in title, and therefore do not discuss the other reasons advanced by Fidelity in support of the judgment.

Title is marketable if it is sufficiently free from legal and equitable defects to enable the holder to retain the property, possess it in peace and, when the time comes to sell it, to be reasonably certain that no doubt about the title will arise to adversely affect its market value. (*Mertens v. Berendsen* (1931) 213 Cal. 111, 113 [1 P.2d 440]; *Palos Verdes Corp. v. Housing Authority* (1962) 202 Cal.App.2d 827, 838 [21 Cal.Rptr. 225].) Impaired *value* is not the same as a defect in title (*Hocking v. Title Ins. & Trust Co.* (1951) 37 Cal.2d 644, 652 [234 P.2d 625, 40 A.L.R.2d 1238]), and the relevant point here is that MAI's title to each of the 16 properties was free of defects and marketable without restriction.

Undisputed evidence established that MAI was the victim of a fraudulent scheme in which the 16 properties insured by Fidelity were overvalued, that MAI's loans on those properties were for more than the true value of the properties, that all of the loans were secured by deeds of trust in favor of MAI, that MAI ultimately foreclosed on all 16 deeds of trust, and that MAI thereby obtained valid, unconditional title to all 16 properties without encountering any title defects. No more is necessary to establish that MAI's losses were caused by the fraudulent loan scheme, not by a past or present defect in the title to any of these properties. (*Lawrence v. Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70, 74-75 [237 Cal.Rptr. 264] [title insurance is a contract for indemnity under which the insurer is obligated to pay for losses sustained as the result of a missed lien or encumbrance affecting title].) Since MAI's losses were not caused by a defect in title, Fidelity had no duty to indemnify MAI against its losses (*Karl v. Commonwealth Land Title Ins. Co., supra,* 20 Cal.App.4th at p. 978), and the cases cited by MAI

---

[4]The trial court found "there were no title infirmities preventing [MAI] from foreclosing on the subject properties. The fact that upon sale, some of the properties were not worth the amounts outstanding on the loans does not create a triable issue of fact because such loss is not covered by [Fidelity's] title insurance policy."

are all distinguishable on this basis. (E.g., *Mutual B.-L. Assn. v. Security T. I. & G. Co.* (1936) 14 Cal.App.2d 225, 228 [57 P.2d 1392] [where the lender's loss was caused by the loss of its security due to a defect in title]; *Mellinger v. Ticor Title Ins. Co. of California* (2001) 93 Cal.App.4th 691 [113 Cal.Rptr.2d 357] [where the question was whether an encroachment affected the marketability of title].)[5]

Fidelity's motion was properly granted.

## III.

In conclusory form and without citation to the record on appeal, MAI contends its motion to tax costs claimed by both F&D and Fidelity should have been granted. MAI objects to a filing fee for a motion made by F&D, to the cost of deposing MAI's principals, and to other items generally (such as service of process fees). We summarily reject this claim of error on the ground that it has been abandoned by MAI's failure to develop it. In any event, it does not appear that the trial court abused its discretion. (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 130-131 [84 Cal.Rptr.2d 753].)

## DISPOSITION

The judgments are affirmed. F&D and Fidelity are awarded their costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

---

[5]The fact that the loans and resulting deeds of trust were obtained by fraud or forgery would make the deeds voidable, not void, and the strawman buyers who did not know their names were used would in any event be estopped from denying MAI's (or a subsequent buyer's) title to the properties. (*Chapman v. Title Guar. & Trust Co.* (1938) 25 Cal.App.2d 567, 577 [78 P.2d 268]; *Reusche v. California Pac. Title Ins. Co.* (1965) 231 Cal.App.2d 731, 738 [42 Cal.Rptr. 262].) Of course, the deeds of trust foreclosed upon by MAI have in any event been extinguished. (*Ralph C. Sutro Co. v. Paramount Plastering, Inc.* (1963) 216 Cal.App.2d 433 [31 Cal.Rptr. 174].) There was no defect in the title, and there is none now.