**NOT FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

TOLL BROTHERS, INC., a Delaware corporation,

       Plaintiff-Counter-Defendant-Appellant,

  v.

CHANG SU-O LIN; HONG LIEN LIN; HONG YAO LIN, individuals,

       Defendants-Counter-Claimants, Appellees.

No. 09-16955

D.C. No. 3:08-cv-00987-SC

MEMORANDUM[*]

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Argued and Submitted November 4, 2010
San Francisco, California

Before: GOULD, CALLAHAN, Circuit Judges, and KORMAN, District Judge.[**]

Toll Brothers, Inc. ("Toll") appeals from a judgment entered in the United States

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**]     The Honorable Edward R. Korman, Senior United States District Judge, Eastern District of New York, sitting by designation.

District Court for the Northern District of California following a bench trial in favor of Chang Su-O Lin, Hong Lien Lin, and Hong Yao Lin ("the Lins"). The complaint, based on diversity of citizenship, arose out of a purchase and sale agreement ("PSA") in which the Lins agreed to sell Toll–a national homebuilder– three separate parcels of land in Dublin, California in three separate closings for a total sale price of $241,500,000. Toll deposited $21,735,000 into an escrow account to be paid out in increments with each property closing. Toll and the Lins successfully closed on two parcels of land, Sub-Areas 1 and 2. The disputed issue here involves the Sub-Area 3 closing scheduled for June 30, 2007.

Specifically, without consulting Toll, the Lins had negotiated and executed an easement to PG&E across Sub-Area 3 on December 12, 2005 for the construction of temporary overhead power lines. In addition, the Lins installed six above-ground utility vaults on the property, which Toll challenged on the basis that not all of the vaults were necessary and the placement of the vaults interfered with Toll's development plans for the property. Although the Lins had proposed language terminating the recorded easement on December 31, 2006, PG&E would not agree to a fixed termination date. By September 2006 the Lins had completed all of the work necessary for the removal of the temporary power lines from Sub-Area 3and applied to PG&E for removal of the temporary overhead power lines. Despite numerous unsuccessful emails and phone calls from the Lins to PG&E throughout 2007 attempting to get the easement

2

extinguished, PG&E did not quitclaim the power line easement back to the Lins prior to the scheduled closing of Sub-Area 3. With the easement still conveyed to PG&E, and no knowledge or reasonable expectation of when it would be extinguished, Toll terminated the PSA in December 2007, more than five months after the closing date for Sub-Area 3 specified in the PSA.

Toll then filed suit for a return of escrow for Sub-Area 3 in the amount of $7,735,000 alleging that the conveyance and continued existence of the power line easement to PG&E over Sub-Area 3 and the installation of the utility vaults constituted breaches of the PSA. In the alternative, Toll alleged that the PSA was illegal and void because it failed to comply with the Subdivision Map Act. Pursuant to § 4.4 of the PSA, the Lins seek to retain Toll's $7,735,000 deposit as liquidated damages.[1]

Although numerous issues are raised, we need only address two of them here to resolve the appeal.

## A. The Power Line Easement

The first and most significant issue is whether the power line easement across Sub-Area 3 that continued to exist for more than five months after the scheduled close of Sub-Area 3 constituted a breach of the PSA sufficient to permit Toll to rescind the contract and recover its deposit.

---

[1] Section 4.4 of the PSA provides that if the sale of property is not "consummated as a result of the buyer's default under the agreement and if seller is not also in default," the deposit "shall be retained by seller as liquidated damages."

The district judge found that the Lins' grant of an easement to PG&E for the installation of temporary power lines did not constitute a breach of the PSA because it did not interfere with Toll's planning for Sub-Area 3. In arriving at this conclusion, the district judge relied on the following findings of fact: 1) Toll knew the power lines were intended to be a temporary installation; 2) Toll had ceased making plans to develop Sub-Area 3 at the time of the scheduled closing in June 2007; and, 3) Toll's planning for the development of Sub-Area 3, if restarted, would have taken at least a year so the easement, extinguished in June 2008, did not limit Toll's ability to develop the land. Despite finding that the Lins "had not complied with all the requirements in the PSA" in granting the easement, the district judge held that the Lins' violation of the PSA "was not significant enough to justify Toll's termination of the contract." In sum, although the Lins may have violated the contract, their conduct did not amount to a *material breach* sufficient to justify Toll's rescission. We disagree.

Under California law, the buyers of real property are entitled to take title clear of encumbrances or defects. *See Eason v. Montgomery*, 27 P. 280, 282 (Cal. 1891) (in contracts "for the sale of land there is an implied condition that the title of the vendor is good, and that he will transfer to the vendee... a title unencumbered and without defect"); *Crim v. Umbsen*, 103 P. 178, 180 (Cal. 1909) (it is a buyer's "right... to receive a perfect title of record... within the time specified in the agreement"). A marketable title "means a title which a reasonable purchaser, well informed as to the facts and their

4

legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear on such transactions, be willing and ought to accept." *Hocking v. Title Ins. & Trust Co.*, 234 P.2d 625, 649-50 (Cal. 1951).

A seller's failure to deliver unencumbered, marketable or agreed-upon title when a contract matures constitutes a breach and allows rescission. *See Post v. Palpar, Inc.*, 7 Cal. Rptr. 823, 826 (Cal. Ct. App. 1960) (holding that the "failure to tender marketable title at the time the contract matures is a material breach"); *Fristad v. Thompson*, 276 P.2d 116, 118 (Cal. Ct. App. 1954) (when seller deeds a perpetual easement to the city for the construction of a sewer across property under contract to a homebuilder, rescission by the homebuilder is valid because he was "entitled to a conveyance of the full title and to possession of all of the property"); *Thomas v. Spitzer*, 260 P. 833, 833-34 (Cal. Ct. App. 1927) (where a seller's failure to obtain a guarantee of title as stipulated in the agreement permitted buyer's rescission); *Switzler v. Robert A. Klein & Co.*, 271 P. 367, 369-70 (Cal. Ct. App. 1928) (when seller grants an easement to the city to build a sewer line without the knowledge or consent of buyers who had entered into an agreement to purchase the land, consideration failed and the plaintiffs were entitled to rescind the contract).

Rescission by the buyer when seller cannot deliver marketable title after a reasonable period of time is justified even when seller claims that a remedy to the

5

encumbrance or defect is available or forthcoming, because a buyer "is entitled to a title that is fairly deducible of record, free from reasonable doubt and litigation." *Whelan v. Rosseter*, 82 P. 1082, 1083 (Cal. Ct. App. 1905); *Crim v. Umbsen*, 103 P. 178, 180 (Cal. 1909); *see also*, *Fristad v. Thompson*, 276 P.2d 116, 118 (Cal. Ct. App. 1954) (a buyer is "not obliged to accept a mere paper title, to bring an action for possession against another party, and to rely upon their possible success in such an action"). A marketable title "must not only be free of actual defects but also of reasonable doubt and probable litigation." *Lansburgh v. Market St. Ry. Co.*, 220 P.2d 423, 426 (Cal. Ct. App. 1950).

Particularly apposite here is *Leiter v. Handelsman*, 270 P.2d 563, 564-65 (Cal. Ct. App. 1954), where the seller was unable to deliver clear title on the closing date because the land contained guy wires and an easement in favor of the power company. Although the power company agreed to remove the guy wires and quitclaim the land back to the seller, these actions were delayed, leading the buyers to cancel escrow and demand a return of their deposit. *Id*. at 564. Despite the fact that the power company removed the wires and executed a quitclaim deed the day after the buyer's rescission, only three weeks after the scheduled closing date, *id*., the rescission was upheld because the sellers were unable to deliver marketable title "[w]ithin a reasonable time after the" scheduled closing. *Id*. at 568. Similarly, in *Ward v. Downey*, 213 P.2d 523, 526 (Cal. Ct. App. 1950), it was held that the possibility of an estate tax in an unspecified amount

6

on property to be sold constituted a defect in title that made it unmarketable, thereby allowing buyers to rescind the contract even though the exact amount of such tax was determined within 12 days of the scheduled closing and could have been cured by the sellers if they paid the taxes.[2] Moreover, as the dissent points out, under California law, motive "is irrelevant to determining if there was a breach or inevitable breach on closing." Dissent at 4. Nevertheless, relying on the Restatement (Second) of Contracts, the dissent suggests that motive is relevant "in assessing whether that breach was material." Dissent at 4. Research has not uncovered a California case relying on the Restatement (Second) of Contracts § 241 (1981) (or a comparably worded section in the Restatement (First) of Contracts § 275 (1932)) in the context of a contract for the sale of real property. Moreover, California law holds that a buyer's motive in rescinding a contract for the sale of land is not relevant to an assessment of his legal rights or fulfillment of legal obligations under a contract, including whether a material breach occurred. Specifically, as the Supreme Court of California has held:

> We cannot consider the motives which prompted respondent
> to rescind the contract of sale. It was his right under that

---

[2] While these are, for the most part, intermediate appellate court decisions, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236-37 (1940); *see also, Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1012-13 (9th Cir. 2004).

7

> instrument to receive a perfect title of record at the time or within the time specified in the agreement. This the plaintiffs could not give him. He was entitled to rest upon the provisions of the contract, whether or not his real purpose was to avoid taking and paying for a tract of land that had depreciated in value.

*Crim*, 103 P. 178, 180 (Cal. 1909); *see also De Bairos v. Barlin*, 190 P. 188, 191 (Cal. Ct. App. 1920) ("The courts have held that the motives of the vendee in rescinding may not be inquired into when he has a legal reason for rescinding and relies thereon").

Contrary to the dissent, we do not suggest that *"*California law requires us invariably to view any failure to be in a position to tender clear title on the closing date as per se a material breach." Dissent at 1. Our decision that the power line easement constituted a breach of the PSA is not based solely on the inability of the Lins to deliver unencumbered title on the scheduled closing date. Indeed, Toll did not rescind because the Lins had not cured the defect in title by the closing date specified in the PSA. Instead, Toll waited over five months beyond the scheduled closing before rescinding the contract. Moreover, despite the fact that the Purchase Sale Agreement gave the Lins the option to extend closing in order to cure a breach of contract, the Lins made it clear prior to the scheduled closing on June 30, 2007, that they *would not* extend closing. Later, in negotiations after the scheduled closing, the Lins offered to extend the close *only if* Toll provided additional security and agreed to accept the current location of the utility vaults which was also in dispute between the parties.

8

Significantly, the dispute created by the power line easement was of the Lins own making because they chose to violate the Purchase Sale Agreement by conveying an easement to PG&E without Toll's knowledge or consent and without requiring a termination date on the conveyed easement. Moreover, the breach created by the power line easement was, as the dissent acknowledges, "of uncertain and unspecified duration." Dissent at 2. Thus, despite seeking the removal of the power lines following the completion of an underground trench in September 2006 and numerous communications with PG&E throughout 2007, the Lins were unsuccessful in extinguishing the easement and could not provide a date-certain as to when the easement would be extinguished. While the dissent argues, with the benefit of hindsight, that the easement had "no practical impact," Dissent at 5, it ignores the fact that, when Toll rescinded the contract, it did not know *when* or *if* the easement would be extinguished, or if doing so would require legal action.

Nor do we agree with the dissent that the "Lins suffer a major forfeiture over what seems a hypertechnical breach." Dissent at 5. We pass over the fact that the major forfeiture here may be the $7,735,000 that Toll will forfeit to the Lins as liquidated damages without regard to any actual damage suffered by the Lins. In essence, if the Lins prevail, they will get to keep their land plus $7,735,000. This notwithstanding the fact that they rejected the option to extend the closing of Sub-Area 3, insisting instead upon closing as scheduled despite their inability to convey title "free from reasonable

9

doubt and litigation," *Whelan v. Rosseter*, 82 P. at 1083.[3] Under California law, this was more than a "hypertechnical breach." Dissent at 5; *see Ward*, 213 P.2d at 526; *Leiter*, 270 P.2d at 564-65. Moreover, although the dissent suggests that at issue here is "a large development contract that placed certain obligations on each party, and that called for cooperation," Dissent at 6, our review of the record suggests that it was the Lins rather than Toll whose conduct was consistent with this vague mandate. Toll waited more than five months after the specified closing date before rescinding the contract and, unlike the Lins, was willing to extend the closing date even further.

## B. The School Site

The PSA obligated Toll, as the buyer of Sub-Area 2, to reconvey a parcel of Sub-Area 2 to the Lins after designating this land as a "School Site." Reconveyance of the school site was made a special closing condition for the third closing: "Buyer shall have reconveyed to Seller or Seller's assignee the elementary school parcel in Sub-Area 2." The Lins argue that reconveyance of the school site "was a *fundamental governmental*

---

[3] Toll does not challenge the validity of § 4.4, the clause in the PSA that provides for payment of liquidated damages to the Lins in the amount equal to the $7, 735,000 held in escrow in the event of Toll's default, provided that the Lins are not in default. While such clauses in the sale of real property are valid if the down payment is a reasonable amount, when "the evidence establishes that it would not 'be impracticable or extremely difficult to fix the actual damage'... such a provision may not be enforced as one for liquidated damages." *See Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish*, 230 P.2d 629, 633 (Cal. 1951) (internal citations omitted) (Traynor, J.). Because Toll does not raise the issue of the enforceability of the liquidated damages clause, however, we did not reach it here.

10

*and regulatory prerequisite* for the entire development," the failure of which permitted the Lins "to extend the close of escrow past the original scheduled 'close' date."

The district judge held that "Toll's failure to reconvey the school site was not a failure to perform a condition precedent to the Lins' duty to sell Sub-Area 3," because the school site had been assigned to another party prior to the closing of Sub-Area 3 and therefore was not Toll's to convey. Accordingly, Toll did not breach the PSA by failing to reconvey the school site. Nevertheless, he held that Toll's failure to comply with this provision gave the Lins the right to extend closing beyond the scheduled date of June 30, 2007.

We agree with the district judge that Toll did not breach the PSA by failing to reconvey the school site – a holding that the Lins do not challenge on this appeal. Notwithstanding his finding that there was no breach, the district judge held that Toll's failure to reconvey the school site gave the Lins the right to indefinitely extend the closing date. Consequently, their failure to close, as late as five months after the closing date specified in the PSA, did not constitute a breach entitling Toll to rescind the agreement. While the logic of this argument escapes us, even if the Lins had the right to extend closing, this right was effectively waived when they insisted, with full knowledge that the school site had yet to be reconveyed, that the closing of Sub-Area 3 proceed as scheduled.

The judgment of the District Court is

11

**REVERSED**.

*Toll Brothers, Inc. v. Su-O Lin et al.*, No. 09-16955

GOULD, J., dissenting:

I respectfully dissent. The district court held a trial that occupied nine days. The district court made detailed factual findings that illuminate the grounds for its decision that the Lins had not materially breached the purchase and sale agreement. Those factual findings are not challenged on appeal and thus are conceded as true. The majority rests its opinion primarily on the premise, I think questionable, that California law requires us invariably to view any failure to be in a position to tender clear title on the closing date as per se a material breach.[1] Hence, the majority reasons, the granting of a temporary easement to Pacific Gas & Electric Company (PG&E) for overhead power lines constituted a material breach of the purchase and sale agreement. The majority relies on California law for the principle that there is an implied condition in every contract for sale of real property that the seller will convey title unencumbered and without defect, and that the failure to tender marketable title at the time a contract matures is a material breach granting the purchaser the right to rescind. *See, e.g., Crim v. Umbsen*, 103

---

[1] The majority disclaims reliance on this premise and mentions other circumstances, such as the delay from scheduled closing to declaration of breach, to support its conclusion. However, I believe the majority comes close to this premise because the other circumstances cited do not significantly impact the analysis.

1

P. 178, 180 (Cal. 1909).

In a case such as this, we are bound to apply state law, which requires us to make our best estimate of how the California Supreme Court would rule on the issue if tendered to it. *See Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001). Here, in light of the consistent statements in the California cases on the importance of tendering clear title, I concur in the majority's conclusion that at least the temporary power line easement, and perhaps also the building of the six utility vaults without consent or consultation was a breach. Nonetheless, I believe that in the unusual circumstances of this case, the California Supreme Court would view the power line and utility vault easements as at most partial breach. Largely for reasons supported by the district court's extensive and unchallenged factual findings, I would hold that only a partial breach occurred, not one permitting Toll Brothers to rescind the contract.

Here are some of the salient points that impact my analysis. First, the power easement was temporary, and, although it was of uncertain and unspecified duration and had to be removed by PG&E, it is also true that the local governing authority, the city, would not allow above ground power lines to remain. Given the temporary nature of these lines, I must view any breach by their introduction on the land as a de minimis problem that surely would have been worked out before Toll

2

Brothers had to do any development work or construction on the project.

Second, although California law may compel us to conclude there was a breach by inability to tender clear title, I do not accept the idea that all of the circumstances detailed by the district court in its findings after trial are wholly irrelevant to whether the breach was a partial breach or a material breach. There are California cases, *e.g. Fristad v. Thompson*, 276 P.2d 116, 118 (Cal. Ct. App. 1954), suggesting that a failure to deliver clear title warrants rescission, but I see nothing from the California Supreme Court stating that that must invariably be the conclusion. Instead, I take the position that circumstances such as Toll Brothers ceasing work on development efforts regarding Sub-Area 3 before the planned closing date, its failure to cooperate in avoiding problems preventing closing, and its motivation to avoid proceeding during an economic downturn can properly be considered in assessing whether the breach was partial or material. I predict that the California Supreme Court would not view this as a material breach. I am not prepared to rest, so heavily in substance, *see supra* note 1, on the notion that the California Supreme Court would make the transfer of clear title a per se prerequisite to avoid a material breach.

Third, much the same analysis applies to the utility vault issue. Again, title was encumbered by the vaults and attendant easements, but I'm disinclined to view

3

that as a material breach. There was clear testimony that the vaults could be moved at a cost in the range of $300,000-500,000, and so I don't see why, even if damages are uncertain, a district court could not make a finding on partial breach damages and deduct that from the obligations of Toll Brothers. In the total scheme of the contract, the placement of the utility vaults did not constitute material breach, and the evidence showed that a partial breach was compensable.

Fourth, while some California authority suggests that motive is irrelevant, *see, e.g., Crim*, 103 P. at 180, and I would agree it is irrelevant to determining if there was a breach or inevitable breach on closing, I think motive can permissibly be considered in assessing whether that breach was material. Under the Restatement (Second) of Contracts, the key factors are (1) the extent to which the injured party will be deprived of the benefit reasonably expected; (2) the extent to which the injured party can be adequately compensated for deprivation of benefit; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 (1981). Here, those factors in my assessment tend to

4

favor the Lins rather than Toll Brothers. And I see nothing in California law indicating that this influential Restatement principle of contract law would not be followed by the California Supreme Court. That the breach by the Lins in delivering clear title does not seem motivated by any bad faith or errant intentions to me counsels for viewing the breach as not material in context.

Another factor that might be argued to favor Toll Brothers is whether the encumbrance deprives it of what it expected to buy; however, given the temporary nature of the easement, and given that Toll Brothers had suspended development, there is no practical impact of deprivation. Toll Brothers reasonably could have expected the temporary easement to have been removed before it was time for it to start work on construction or antecedent planning. If the temporary easement caused some delay, in my view it is no insurmountable obstacle for experts to give testimony and for the district court to make a finding on the damages from the delay. Conversely, as the majority sees this case, the Lins suffer a major forfeiture over what seems a hypertechnical breach. Also, it was likely that the Lins could cure the breach because of the temporary nature of the easement.

The crux of material breach analysis is this: Toll Brothers was not deprived of any significant part of its bargain as a result of the Lins' breach, in light of Toll Brothers' own plans, a temporary delay on clear title caused it no harm. At the

same time, the Lins did not act in bad faith.  A determination of partial breach at most, as made by the district court, is correct.

Finally, there are pragmatic grounds favoring the district court's approach. This was a large development contract that placed certain obligations on each party, and that called for cooperation.  I fear that the majority's approach will only lead to gamesmanship and less than cooperative behavior between landowner and developer, between a master developer and a developer of component parts, and that aggressive jockeying for position without regard to cooperation will ultimately impose higher prices on consumers who buy homes in the development.

For the above reasons, I would characterize the failings of the Lins as breaches but not as material breaches.  Hence I respectfully dissent.