Filed 5/6/21  Rivera v. Fidelity National Title Insurance etc. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PAIGE ANN RIVERA, <br><br> Cross-complainant and Appellant, <br><br> v. <br><br> FIDELITY NATIONAL TITLE INSURANCE COMPANY, <br><br> Cross-defendant and Respondent. | F078799 <br><br> (Super. Ct. No. 14CECG02395) <br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

LloydWinter, Jody L. Winter and Jennifer J. Panicker for Cross-complainant and Appellant.

Fidelity National Law Group and Thomas A. Trapani for Cross-defendant and Respondent.

-ooOoo-

Plaintiff Dean Hiyama (Hiyama) purchased a single-family home in the City of Fresno while in the midst of a divorce, paying the entire purchase price in cash, but before the escrow closed he and his girlfriend, appellant Paige Ann Rivera (Rivera),

executed an addendum to the escrow instructions directing that Rivera was to be considered the sole buyer of the property—that is, title would be placed in her name. Consequently, when escrow closed the grant deed reflected the property was granted to Rivera alone. Sometime later, however, Hiyama and Rivera had a falling out, and Hiyama brought suit to obtain title to the property. Hiyama's lawsuit claimed Rivera took title merely as an accommodation during his divorce to avoid delay, and it was allegedly understood that Rivera would deed the property back to him. Rivera denied such claims and insisted the property was a gift to her. In the course of their litigation, Rivera filed a cross-complaint against respondent and cross-defendant, Fidelity National Title Insurance Company (Fidelity), claiming that Fidelity was obligated to provide a defense to Hiyama's lawsuit under the title insurance policy issued in her name at the close of escrow. Fidelity filed a motion for summary judgment on the ground that there was no potential basis for coverage under the policy. The trial court granted summary judgment in Fidelity's favor, and Rivera now appeals from that ruling. Under the undisputed facts of this case, we conclude that the trial court correctly granted summary judgment in Fidelity's favor against Rivera's cross-complaint. Based on the express exclusion from coverage for risks created, allowed or agreed to by the insured, there was no potential for coverage under the policy. The judgment for Fidelity is accordingly affirmed.

## FACTS AND PROCEDURAL HISTORY

Hiyama's Lawsuit to Obtain Title

The real property that was the focus of the underlying title or ownership dispute between Hiyama and Rivera is a residence located on Ryan Avenue in Fresno, California (the property). On August 15, 2014, Hiyama filed his original complaint against Rivera to quiet title and for declaratory relief, among other causes of action, primarily seeking to obtain title to the property. In the complaint, Hiyama alleges that on or about April 2, 2013, "as time was of the essence," he "decided to only have [Rivera's] name appear on

2.

the deed as [Hiyama] and his wife were going through a divorce" and it was uncertain whether his wife would timely provide a quitclaim deed—which was apparently needed in order for Hiyama's name to be on the grant deed. Hiyama paid the purchase price of $266,265.40 for the property; and once escrow closed in early April 2013, he moved into the property and resided there. Since that time, Hiyama also paid the property taxes, the utilities and the property insurance. Rivera has helped to renovate and improve the property, but she has not permanently resided there and continues to maintain her residency in the City of Morgan Hill. In July 2014, the parties had a falling out and Rivera asserted the property had been a gift to her. She allegedly threatened to sell it or take other action, which prompted Hiyama to file his lawsuit.

After a series of demurrers and pleading amendments, Hiyama filed a second amended complaint on or about December 22, 2014. The second amended complaint included causes of action for quiet title, declaratory relief, breach of oral contract, constructive trust, and fraud, among others. As before, the operative facts included that time was of the essence, but further specificity was provided. According to the second amended complaint, on April 2, 2013, the escrow officer informed Hiyama that his wife would need to sign a quitclaim deed. Hiyama decided to only have Rivera's name appear on the deed since Hiyama was going through a divorce and it would cause a considerable delay to seek his wife's signature on a quitclaim deed. Hiyama did not want to risk losing the property due to such a delay in the closing of escrow and he also had a pressing need of a place to live since he recently had to vacate his former residence. Rivera allegedly "recommended" the idea that she be the only person on title. As a result, "[o]n or about April 2, 2013, [Hiyama] and [Rivera] agreed to temporarily use [Rivera's] name on title, then have title transferred to [Hiyama], at a later date." With that understanding, Hiyama paid the purchase price, and, once escrow closed, he moved into the property. After the parties' falling out in 2014, Rivera informed Hiyama that the property was a gift

to her. Further, after their falling out, Rivera allegedly attempted to extort $150,000 from him, threatened to sell the property, and initiated an unlawful detainer action against him.

The alleged oral agreement that Rivera would temporarily hold title during Hiyama's divorce and would later deed the property to Hiyama was foundational to one or more of the causes of action in the second amended complaint. *Alternatively*, the second amended complaint asserted that Rivera committed promissory *fraud* because, despite her oral agreement, she allegedly never intended to relinquish the title to Hiyama. Fraud was the basis for the cause of action for constructive trust in that pleading.

As procedural background, we briefly note that in 2015 the trial court sustained Rivera's demurrer to most of the causes of action in the second amended complaint without leave to amend on the ground that the allegations were premised on an unenforceable and illegal agreement to deceitfully use marital funds for the purchase of the property in violation of family law statute and a restraining order. On a petition for writ of mandate to this court, we disagreed with the trial court's conclusion and found the oral contract was enforceable. Accordingly, we reversed the trial court's order sustaining demurrer and remanded the case back to the trial court. On remand, the trial court entered a new order on September 15, 2016, overruling the demurrer to the second amended complaint.

On April 4, 2018, Hiyama filed a third amended complaint. This was the operative pleading against Rivera at the time Fidelity brought its motion for summary judgment on the ground it had no duty to defend Rivera. For purposes of our discussion of issues raised in the present appeal, the third amended complaint is what is generally referred to herein as Hiyama's lawsuit against Rivera.[1] Significantly, the third amended complaint clarified that the equitable theory for the specific relief Hiyama sought in his

---

[1] That is, references in this opinion to Hiyama's lawsuit and the third amended complaint are used interchangeably.

4.

pleading (i.e., obtaining title to the property) included that of a *resulting trust*. We note that resulting trust was the theory under which Hiyama eventually prevailed following a trial on the merits.

To shed light on the nature of the issues raised by Hiyama's pleading of a resulting trust, we briefly describe the fundamentals of such a cause of action. Under California law, a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price is paid by one person and the title is taken in the name of another. (*Lloyds Bank California v. Wells Fargo Bank* (1986) 187 Cal.App.3d 1038, 1043; accord, *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342; *Estate of Yool* (2007) 151 Cal.App.4th 867, 874; see *Fidelity National Title Ins. Co. v. Schroeder* (2009) 179 Cal.App.4th 834, 847–848.) " 'The trust arises because it is the natural presumption in such a case that it was their intention that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired.' " (*Martin v. Kehl* (1983) 145 Cal.App.3d 228, 238.) That is, a resulting trust is an obligation implied by law to carry out the presumed intentions of the parties under such circumstances. (*Bainbridge v. Stoner* (1940) 16 Cal.2d 423, 428.) " 'It has been termed an "intention-enforcing" trust, to distinguish it from the other type of implied trust, the constructive or "fraud-rectifying" trust. The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them.' " (*Fidelity National Title Ins. Co. v. Schroeder*, *supra*, 179 Cal.App.4th at p. 848, quoting 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 311, p. 885.) It differs from an express trust in that it arises by operation of law from the particular facts and circumstances, and thus it is not essential to prove an express or written agreement to enforce such a trust. (*Fidelity National Title Ins. Co. v. Schroeder*, *supra*, at p. 848.) The resulting trustee's sole responsibility is that of holding onto and then conveying title to the beneficiary of the trust, who is the person to whom the property properly belongs. (*Bainbridge v. Stoner*, *supra*, 16 Cal.2d at p. 428.) An exception exists where the circumstances reflect

a gift was intended. (See *Socol v. King* (1950) 36 Cal.2d 342, 348; *Lloyds Bank California v. Wells Fargo Bank*, *supra*, 187 Cal.App.3d at p. 1043 [presumption of gift to one's child rebutted presumption of resulting trust].)

Fidelity Denies Rivera's Request to Defend Lawsuit under the Title Insurance Policy

In July 2016, as the litigation between Hiyama and Rivera continued, Rivera requested that Fidelity provide coverage under the title insurance policy by defending against the claims asserted in Hiyama's lawsuit since they potentially impacted her title or ownership of the property. By letter dated August 30, 2016, Fidelity denied Rivera's tender of the defense of Hiyama's lawsuit and declined to provide coverage for the same. Fidelity's denial was based on exclusions from coverage in the title insurance policy, including an express exclusion for risks that are "created, allowed, or agreed to" by the insured.

Rivera's Cross-complaint

In response, Rivera filed a cross-complaint and subsequently a first amended cross-complaint against both Hiyama and Fidelity. Concerning Fidelity, Rivera alleged a breach of its contractual obligation to provide title insurance coverage to her inasmuch as Hiyama's lawsuit asserted an alleged right to obtain title to the property adverse to her ownership. The two causes of action asserted by Rivera against Fidelity in the first amended cross-complaint consisted of the following: (i) a cause of action for breach of written insurance contract; and (ii) a cause of action for bad faith denial of coverage or breach of the implied covenant of good faith and fair dealing.

By the time of Fidelity's summary judgment motion at issue in this appeal, the operative pleading was Rivera's third amended cross-complaint, which contained the same two causes of action against Fidelity, numbered as the sixth and seventh causes of action. For convenience, we refer to Rivera's pleading against Fidelity as simply the cross-complaint.

Fidelity's Motion for Summary Judgment

On June 29, 2018, Fidelity filed its motion for summary judgment or alternatively for summary adjudication (motion for summary judgment) as to Rivera's causes of action against Fidelity alleged in her cross-complaint; that is, the sixth and seventh causes of action thereof.[2] Fidelity's motion for summary judgment was made on the ground that Rivera's causes of action against Fidelity were without merit because, under the undisputed facts, the claims alleged in Hiyama's underlying lawsuit against Rivera were either not within the scope of the insuring provisions of Fidelity's policy of title insurance or were excluded from coverage under that policy. The motion was primarily based on the allegations set forth in Hiyama's lawsuit against Rivera and the terms of Fidelity's title insurance policy.

Fidelity's motion for summary judgment was heard by the trial court on September 13, 2018, and the matter was taken under submission. On October 9, 2018, the trial court issued its written order granting Fidelity's motion for summary judgment. In its order, the trial court explained that, under the undisputed facts, Hiyama's claims against Rivera (e.g., for fraud) affecting title or ownership of the property did not arise until the occurrence of conduct *after* escrow closed, and the close of escrow was the effective date of the policy. According to the trial court, since those claims did not exist at the time the policy issued, there was no potential for coverage under the clear terms of the policy. Accordingly, the motion was granted.

---

[2]     We note Hiyama *also* filed a motion for summary adjudication at that time, seeking an adjudication that he was entitled to obtain title of the property as a matter of law. The trial court denied Hiyama's motion due to triable issues of material fact, including whether having title put in Rivera's name was intended as a gift, or conversely, whether the parties had an agreement that title would be transferred to Hiyama once his divorce was final.

Rivera moved for reconsideration of the order granting summary judgment, but that request was denied by the trial court on January 10, 2019, based on Rivera's failure to present any new or different facts, circumstances or law.

On January 30, 2019, Rivera filed the present appeal from the trial court's grant of summary judgment in favor of Fidelity under Rivera's cross-complaint.[3] In her appeal, Rivera contends the trial court erred because coverage potentially existed under the terms of the policy; i.e., Fidelity had a duty to defend Hiyama's lawsuit.

Hiyama Ultimately Prevails Against Rivera After Trial on the Merits

The underlying dispute between Hiyama and Rivera as to title or ownership of the property was subsequently tried on the merits, and Hiyama prevailed. In its statement of decision filed on April 30, 2019, the trial court found that the property was not intended as a gift to Rivera, and her only legal ownership in that property was that of a resulting trustee in favor of Hiyama. In other words, Hiyama prevailed at trial under a resulting trust theory. Consequently, Rivera was ordered to deed the property to Hiyama.

As noted, however, the present appeal is not from the trial court's judgment entered following trial of the underlying property lawsuit, but from its decision granting Fidelity's motion for summary judgment on the insurance coverage causes of action alleged in Rivera's cross-complaint.

**DISCUSSION**

**I. Standard of Review**

Summary judgment is proper if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c,

---

**3** Although an order granting summary judgment is not itself an appealable order because the appeal must be taken from a judgment entered on the basis of that order, in the interests of justice and to avoid unnecessary delay, we may construe the order granting summary judgment as incorporating an appealable judgment. (*Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 761–762, fn. 7.) We do so here.

subd. (c).)  A defendant or cross-defendant moving for summary judgment has the initial burden of showing, with respect to each cause of action alleged against it in the complaint or cross-complaint, that the cause of action is without merit.  (Code Civ. Proc., § 437c, subd. (p)(2); *Leyva v. Garcia* (2018) 20 Cal.App.5th 1095, 1101.)  A defendant or cross-defendant meets that burden by showing one or more elements of the cause of action cannot be established, or there is a complete defense thereto.  (Code Civ. Proc., § 437c, subd. (p)(2).)  If the defendant or cross-defendant makes such a showing, the burden shifts to the plaintiff or cross-complainant to produce evidence demonstrating the existence of a triable issue of material fact.  (*Ibid.*; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)  If the plaintiff or cross-complainant fails to meet that burden, the motion will be granted.  (*Leyva v. Garcia*, *supra*, 20 Cal.App.5th at p. 1102.)

On a summary judgment motion where, as here, an insurer seeks to prevail on the ground that it did not have a duty to defend its insured against a third party lawsuit, the insurer must present undisputed facts establishing the absence of any potential for coverage.  Whereas, the insured defeats such a motion by showing a potential for coverage exists—i.e., that the underlying claim may fall within policy coverage.  (*Albert v. Mid-Century Ins. Co.* (2015) 236 Cal.App.4th 1281, 1290; *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.)

On appeal, we independently review the correctness of the trial court's ruling on a motion for summary judgment.  (*RNT Holdings, LLC v. United General Title Ins. Co.* (2014) 230 Cal.App.4th 1289, 1294; *Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 658.)  "In determining whether a summary judgment motion was properly granted, 'we review the trial court's decision de novo, applying the rule that "[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail." ' [Citation.]" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 641.)  Where the trial court's ruling is based on interpretation of insurance policy language, which is a question of law, our

9.

review of that question is also de novo. (*Ibid.*) " 'Summary judgment is an appropriate vehicle to determine coverage under an insurance policy when it appears there is no material issue of fact to be tried and the sole issue before the court is one of law ….' " (*First American Title Ins. Co. v. XWarehouse Lending Corp*. (2009) 177 Cal.App.4th 106, 113.)

We review the trial court's ruling and not its reasoning; thus, we may affirm a trial court's decision granting summary judgment if the ruling was correct as a matter of law, even if erroneously reasoned. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.)

## II. Evidentiary Objections

Rivera broadly argues the trial court erred by failing to sustain her evidentiary objections concerning the facts set forth in Fidelity's motion for summary judgment. However, Rivera's opening brief fails to discuss any specific objections she raised in the trial court to any particular evidence or facts that purportedly should have been sustained, nor has she presented any reasoned legal argument and authority to support her position or to demonstrate the occurrence of a prejudicial error. Rivera has patently failed to meet her burden as appellant to affirmatively demonstrate error on the issue of evidentiary objections. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655; *Yield Dynamics, Inc. v. TEA Systems Corp*. (2007) 154 Cal.App.4th 547, 556–557 [as order or judgment of trial court presumed correct, error must be affirmatively shown].) We may disregard such conclusory and perfunctory assertions on appeal, and we ordinarily treat such issues as forfeited. "Where a point lacks adequate legal discussion or citation to authority, we may treat it as abandoned." (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1399.) We do so here.

## III. Important Factors Bearing on the Scope of Insurance Coverage

As a preface to our determination of the insurance coverage issues before us, we first outline some of the principles and circumstances material to that issue, including the

special nature of title insurance, the rules for scope of coverage and construction of insurance policies, and the actual language of the subject policy in this case. After this initial framework for our analysis has been set forth, we will proceed to address the question of whether coverage (i.e., a duty to defend) existed in this case.

A.  The Nature of Title Insurance

Title insurance is a contract to indemnify against loss through defects in the title or against liens or encumbrances that may affect the title at the time when the policy is issued.  (*Elysian Investment Group v. Stewart Title Guaranty Co*. (2002) 105 Cal.App.4th 315, 320; see Ins. Code, § 12340.1; *Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1499–1500 [stating general rule that title insurance does not cover changes in the condition of title after the policy is issued].)  "Title insurance, as opposed to other types of insurance, does not insure against future events.  It is not forward looking.  It insures against losses resulting from differences between the actual title and the record title as of the date title is insured.  The policy does not guarantee the state of the title.  Instead, it agrees to indemnify the insured for losses incurred as a result of defects in or encumbrances on the title."  (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 41.)  As we recently stated in *Hovannisian v. First American Title Ins. Co*. (2017) 14 Cal.App.5th 420:  "Title insurance is fundamentally different from other types of insurance because it is not prospective in nature; it does not insure against title defects or liens that arise after the effective date and time of the policy.  [Citation.]  Moreover, title insurance does not insure against the conduct, or the alleged conduct, of the insured [citation], and does not cover 'matters involving personal dealings between individuals' [citation]."  (*Id.* at pp. 429–430; accord, *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co*. (2013) 217 Cal.App.4th 62, 75–79; *Safeco Title Ins. Co. v. Moskopoulos* (1981) 116 Cal.App.3d 658, 665–668 (*Safeco*).)

B.  Scope of Coverage Principles and Construction of Insurance Policy

A title insurance policy is interpreted under the well-established rules for interpretation of insurance agreements.  (*Hovannisian v. First American Title Ins. Co.*, *supra*, 14 Cal.App.5th at p. 430.)  An insurer owes a duty to defend its insured against claims creating a potential for indemnity under the insurance policy.  (*Albert v. Mid-Century Ins. Co.*, *supra*, 236 Cal.App.4th 1281, 1289.)  That is, " ' "the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." ' " (*Montrose Chemical Corp. v. Superior Court*, *supra*, 6 Cal.4th 287, 295.)  The duty to defend is broader than the duty to indemnify, and thus the duty to defend may exist even where coverage is in doubt and ultimately does not develop.  (*State Farm General Ins. Co. v. Frake* (2011) 197 Cal.App.4th 568, 577.)

A duty to defend a claim due to a potential for coverage under the policy may arise (a) from the nature of the allegations in the third party complaint, and *also* (b) from "facts known to the insurer and extrinsic to the third party complaint."  (*Montrose Chemical Corp. v. Superior Court*, *supra*, 6 Cal.4th 287, 296.)  Consequently, "an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement."  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19.)

As summarized by the Supreme Court in *Hartford Casualty Ins. Co. v. Swift Distribution*, *Inc*. (2014) 59 Cal.4th 277:  " 'Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy.  [Citation.]  But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered.'  [Citation.]  This includes all facts, both disputed and undisputed, that the insurer knows or ' "becomes aware of" ' from any source [citation], 'if not "at the inception of the third party lawsuit," then "at the time of tender" ' [citation].  'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where,

12.

under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.' [Citation.]" (*Id*. at p. 287.) Thus, if any facts alleged in the complaint or fairly inferable from the same, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises. (*Ibid*.) In general, doubts as to whether an insurer owes a duty to defend must be resolved in favor of the insured. (*Ibid*.)

While the duty to defend is broad, it is not unlimited; it is measured by the nature and kinds of risks covered by the policy. (*Waller v. Truck Ins. Exchange, Inc*., *supra*, 11 Cal.4th at p. 19.)

C. The Terms of the Title Insurance Policy

Insurance policies contain two essential parts: the insuring or coverage provisions defining the type of risks covered, and the exclusions, which remove coverage for certain risks that may come within the insuring provisions. (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*, *supra*, 217 Cal.App.4th at pp. 76–77.) To protect the interests of the insured, coverage provisions are interpreted broadly, and exclusions are interpreted narrowly. (*Medina v. GEICO Indemnity Co*. (2017) 8 Cal.App.5th 251, 259.) The clear and explicit meaning of the policy's written provisions, as interpreted in their ordinary and popular sense, controls judicial interpretation, unless the words were used by the parties in a technical sense or a special meaning is given to them by usage. (*Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 18.) We must also interpret the policy language in context, keeping in mind its intended function in the policy. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc*., *supra*, 59 Cal.4th at p. 288.) Ambiguities in an insurance policy are construed "in favor of the insured, and to protect the insured's reasonable expectations." (*Waranch v. Gulf Insurance Co*. (1990) 218 Cal.App.3d 356, 359; see *Gray v. Zurich Insurance Co*. (1966) 65 Cal.2d 263, 270, fn. 7.)

An insurance company's obligation to indemnify an insured depends upon the nature of the risks covered by the terms of the insurance policy. (*Hovannisian v. First*

*American Title Ins. Co.*, *supra*, 14 Cal.App.5th at p. 429.) "In insurance coverage cases, 'the proper initial focus must be the language of the policy itself….' " (*Golden Security Thrift & Loan Assn. v. First American Title Ins. Co.* (1997) 53 Cal.App.4th 250, 255.) Generally, before a court considers whether any exclusions to coverage apply, it first examines the coverage provisions to determine whether coverage potentially exists at all. (*Rosen v. Nations Title Ins. Co.*, *supra*, 56 Cal.App.4th 1489, 1497.)

It has been observed that there are two types of title insurance policies available to the owners of real property interests in California: California Land Title Association standard coverage (CLTA) policies and American Land Title Association (ALTA) policies. (*Lick Mill Creek Apartments v. Chicago Title Ins. Co.* (1991) 231 Cal.App.3d 1654, 1659.) "CLTA insures primarily against defects in title which are discoverable through an examination of the public record, and ALTA additionally insures against off-record defects …." (*Elysian Investment Group v. Stewart Title Guaranty Co.*, *supra*, 105 Cal.App.4th at p. 318, fn. 1.) Thus, ALTA policies provide greater or more expansive coverage, since they include some off-record matters affecting title. (See *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*, *supra*, 217 Cal.App.4th at p. 76.) The policy in the present case is identified as an ALTA homeowner's policy, bearing a publication date of 2010.

The pertinent language of the policy is set forth below, beginning with the coverage provisions, and then the relevant exclusions from coverage.

1. <u>Coverage Provisions</u>

Under an initial section of the policy entitled "OWNER'S COVERAGE STATEMENT," it is stated as follows: "This Policy insures You against actual loss, including any costs, attorneys' fees and expenses provided under this Policy. The loss must result from one or more of the Covered Risks set forth below.… [¶] Your insurance is effective on the Policy Date. This Policy covers Your actual loss from any risk described under Covered Risks if the event creating the risk exists on the Policy Date

14.

or, to the extent expressly stated in Covered Risks, after the Policy Date." The "Policy Date" under the policy is "April 4, 2013"; the name of the insured is "Paige A. Rivera, a married woman as her sole and separate property"; and Rivera's interest in the "Land" covered by the policy is "A Fee." The "Land" is formally described in an attached exhibit "A" to the policy.

Under the section entitled "COVERED RISKS," the policy expressly describes and enumerates the types of risks that are covered, which include the following: "The Covered Risks are: [¶] 1. Someone else owns an interest in Your Title. [¶] 2. Someone else has rights affecting Your Title because of leases, contracts, or options. [¶] … [¶] 5. Someone else has a right to limit Your use of the Land. [¶] 6. Your Title is defective.… [¶] 7. Any of Covered Risks 1 through 6 occurring after the Policy Date. [¶] … [¶] 10. Someone else claims to have rights affecting Your Title because of fraud, duress, incompetency or incapacity. [¶] … [¶] 29. Your Title is unmarketable …." The term "Title" is defined in the policy as "the ownership of Your interest in the Land, as shown in Schedule A."

After stating the covered risks, the policy provides that Fidelity "will defend Your Title in any legal action only as to that part of the action which is based on a Covered Risk and which is not excepted or excluded from coverage in this Policy.… [¶] We will not pay for any part of the legal action which is not based on a Covered Risk or which is excepted or excluded from coverage in this Policy."

2. Exclusions from Coverage

The relevant exclusions from coverage are set forth in paragraph 4 of the section of the policy under a heading entitled "EXCLUSIONS." Paragraph 4.a. thereof excludes the following matters from coverage: "4. Risks: [¶] a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records." This would appear to be the primary exclusion at issue in this case. In addition, we note paragraph 4.b. states an exclusion for "4. Risks: [¶] … [¶] b. that are Known to You at

15.

the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date."

**IV.  Summary Judgment Properly Granted—Fidelity Had No Duty to Defend**

The coverage issue before us was decided by the trial court in the procedural context of a summary judgment motion.  Therefore, our consideration of the coverage issue requires our review of the matters presented to the trial court in connection with that motion.

As noted, where an insurer seeks relief on the ground that it did not have a duty to defend its insured against a third-party lawsuit, the insurer must present undisputed facts establishing the absence of any potential for coverage.  Whereas, the insured defeats such a motion by showing a potential for coverage exists—i.e., that the underlying claim may fall within policy coverage.  (*Albert v. Mid-Century Ins. Co*., *supra*,  236 Cal.App.4th 1281, 1290; *Montrose Chemical Corp. v. Superior Court*, *supra*, 6 Cal.4th 287, 300.)  "[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Waller v. Truck Ins. Exchange, Inc*., *supra*, 11 Cal.4th at p. 26.)  The duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc*., *supra*, 59 Cal.4th at p. 287.)

A.  Fidelity's Showing as Moving Party

Here, Fidelity's motion for summary judgment on the ground it had no duty to defend Hiyama's lawsuit was based on the material allegations and relief sought in Hiyama's third amended complaint as compared with the language of the policy.  All such matters were set forth in Fidelity's separate statement of undisputed material facts (separate statement) in support of its motion for summary judgment.  Those supporting factual matters, largely derived from Hiyama's third amended complaint against Rivera, included the following:

16.

In March of 2013, when Hiyama was dating Rivera, he learned that he needed to immediately vacate the residence in which he was living. At that time, Hiyama was going through divorce proceedings. On March 29, 2013, Hiyama paid a $2,500 deposit to open escrow for the purchase of the property in question. On April 2, 2013, the escrow company informed Hiyama that his wife would need to sign a quitclaim deed. Hiyama was in the midst of a divorce and believed that his wife would not timely provide a quitclaim deed. Rivera recommended that Hiyama should put the property solely in her name to avoid the need for a quitclaim deed from Hiyama's wife. Hiyama and Rivera signed an April 2, 2013 addendum to the escrow instructions stating that the buyer of the property would be only Rivera. Pursuant to the April 2, 2013 addendum, Hiyama proceeded to purchase the property with only Rivera's name on title. Plaintiff paid the purchase price of $266,265.40 in cash, derived partly from an IRA and partly from a loan from his mother. Title was in Rivera's name alone when escrow closed on April 4, 2013. After escrow closed, Hiyama moved in and he has resided at the property full time. Hiyama has paid for the upkeep of the property, including property taxes, utilities and the property insurance. Rivera and Hiyama repaired, improved and renovated the property together. Rivera occasionally stayed at the property, but her permanent residence was elsewhere. In July 2014, Hiyama and Rivera had a falling out. In August 2014, Rivera claimed the property was a gift to her, and she initiated an action in unlawful detainer to have Hiyama removed from the property.

Relying on the above factual allegations, Hiyama's lawsuit claimed under various theories that he was entitled to receive title to the property from Rivera. According to Fidelity's motion for summary judgment, the gravamen of Hiyama's lawsuit was that Rivera had either committed a breach of an oral contract by remaining on title to the property and/or committed a fraudulent scheme to gain title to the property. We observe that Fidelity's description of the essence of Hiyama's lawsuit was correct, as far as it went, but was incomplete. The description requires further elaboration, which we now

17.

provide. It is true that Hiyama's lawsuit included the material allegation that Hiyama and Rivera agreed to temporarily place Rivera's name on the title, to avoid delay, and then have title transferred to Hiyama at a later date. One of the causes of action was for breach of that oral agreement, and another cause of action was premised on promissory fraud, alleging that Rivera had deceived Hiyama and never intended to deed to property to him as agreed. *Additionally*, *however*, facts supporting a resulting trust cause of action were separately alleged by Hiyama in the lawsuit, and it was evident that resulting trust was a distinct theory for the relief sought therein.

The remainder of Fidelity's showing in support of its motion for summary judgment was a recitation of the relevant terms of the policy, including certain coverage provisions and exclusions. We have set forth the relevant provisions hereinabove. In contending in its motion there was no duty to defend Rivera against Hiyama's lawsuit, Fidelity argued among other things that no potential for coverage existed under the policy because Hiyama's claims (particularly, the fraud claim) occurred after the effective date of the policy, and/or Hiyama's claims were based on risks created or agreed to by the insured and therefore excluded from coverage.

B. Rivera's Opposition to Motion

Rivera's opposition to Fidelity's motion for summary judgment included her declaration denying the facts alleged in Hiyama's complaint and insisting the property was a gift to her from Hiyama. She denied there was any agreement to transfer the property or any fraud on her part. She also denied that Hiyama paid all the upkeep for the property and asserted that she spent thousands of dollars on furnishings and renovations. She said that she did occasionally stay at the property during her relationship with Hiyama, especially on weekends and during renovations. In her opposition, Rivera also pointed out that the original offer to purchase the property was made by Hiyama and Rivera together, and initially they were both listed as the buyers.

Rivera's opposition to the motion argued that Hiyama's lawsuit was within the policy's broad coverage provisions, including for claims affecting title due to alleged fraud under "Covered Risk #10." Further, Rivera argued that the exclusion clauses, when strictly construed, did not defeat the duty to defend that otherwise existed.

C. Trial Court's Ruling

In granting Fidelity's motion for summary judgment, the trial court focused on only one of the many coverage provisions in the policy, i.e., Covered Risk No. 10. Under that provision, assuming no exclusion applied, coverage would exist for a risk that someone else claims "to have rights affecting Your Title because of fraud …." The trial court observed that Covered Risk No. 10 was *not* among the enumerated risks that could be covered under the policy if it occurred after the policy date. The trial court held the claim of fraud did not exist at the time the policy issued, but arose from conduct thereafter, and therefore no coverage existed under the policy.

Rivera moved for reconsideration on the ground the trial court failed to address whether coverage may have existed under any of the other "Covered Risks" under the policy besides Covered Risk No. 10. The trial court denied the motion, stating that all covered risks stated in the policy's coverage provisions were implicitly considered by the court, but the court focused on Covered Risk No. 10 because the parties did so. Since no new facts, circumstances or law were presented, the motion was denied.

D. Our Analysis of the Coverage Issues Presented on Appeal

In the present appeal by Rivera from the summary judgment entered in favor of Fidelity, the overarching legal questions remain the same as they were in the trial court, namely: (i) whether Hiyama's lawsuit potentially came within the policy's coverage provisions, and (ii) even if potentially covered, whether an exclusion from coverage applied. We now address those issues. As will be seen, we agree with the trial court's result that there was no duty to defend (i.e., no potential for coverage), but we reach that

19.

conclusion based primarily on the exclusions in the policy rather than on the coverage provisions.

### 1. Hiyama's Lawsuit Was Within the Coverage Provisions of this Title Insurance Policy

The first question is whether Hiyama's lawsuit against Rivera was potentially covered under the terms of the coverage provisions of the subject policy. As explained below, we conclude that it was.

As alluded to previously, the policy's coverage provisions are broad in scope, describing the risks covered in terms which include the following: "1. Someone else owns an interest in Your Title. [¶] 2. Someone else has rights affecting Your Title because of leases, contracts, or options. [¶] … [¶] 5. Someone else has a right to limit Your use of the Land. [¶] 6. Your Title is defective.… [¶] 7. Any of Covered Risks 1 through 6 occurring after the Policy Date. [¶] … [¶] 10. Someone else claims to have rights affecting Your Title because of fraud, duress, incompetency or incapacity. [¶] … [¶] 29. Your Title is unmarketable …." The term "Title" is defined in the policy as "the ownership of Your interest in the Land, as shown in Schedule A."

Based on a comparison of Hiyama's lawsuit and the policy language, it appears that the lawsuit presented a claim or claims that potentially came within one or more of the above stated coverage provisions. In particular, we find that the *resulting trust* cause of action would, based on the facts alleged, result in Rivera's title or ownership being potentially *defective* or incomplete. Our case law has explained what is meant by a defective title. In contrast to the words " ' "good title" ' " which indicate that " 'the owner has the title, legal and equitable, to all the land,' " the words " ' "defective title" ' " mean " 'the party claiming to own has not the whole title, but some other person has title to a part or portion of the land.' " (*Hocking v. Title Ins. & Trust Co*. (1951) 37 Cal.2d 644, 649.) In the unique situation where a resulting trust arises, it is presumed " 'the transferee was not intended to take the beneficial interest' " (*Fidelity National Title Ins.*

20.

*Co. v. Schroeder*, *supra*, 179 Cal.App.4th at p. 847) but has in good faith "acquired title to property *belonging to another.*" (*Bainbridge v. Stoner*, *supra*, 16 Cal.2d at p. 428, italics added.) Although the resulting trustee does temporarily hold title, it is only as a trustee, and he or she "*does not own* the property in question." (*Estate of Yool*, *supra*, 151 Cal.App.4th 867, 875.) Again, the resulting trustee merely holds "naked legal title" but the party who paid the full consideration for the transfer of the property is the "equitable owner" in whose favor a trust is presumed. (*Nasaroff v. National Union Fire Ins. Co.* (1930) 104 Cal.App. 551, 553 [equitable title under a resulting trust held to be insurable under fire policy as tantamount to a "fee" interest]; see also *Fidelity National Title Ins. Co. v. Schroeder*, *supra*, 179 Cal.App.4th at pp. 849–850 [under circumstances demonstrating resulting trust, lien may attach to beneficial owner's retained equitable interest in property].) Thus, where a resulting trust is established under the facts, "the law implies an obligation on the part of the one in whom title has vested to hold the property for the benefit of the owner, and, eventually to convey to the owner." (*Bainbridge v. Stoner*, *supra*, 16 Cal.2d at p. 428.)

Because the party paying the full consideration for the purchase of property is presumed to be the beneficial or equitable owner thereof, while the other party in whom bare legal title is vested is presumed to be only a trustee, we conclude Hiyama's lawsuit alleging facts supporting a resulting trust cause of action was within the scope of the policy's coverage provision based on Rivera's title potentially being "defective" under Covered Risk No. 6. (See, e.g., *Hocking v. Title Ins. & Trust Co.*, *supra*, 37 Cal.2d at p. 649 [defective means less than whole title].) For similar reasons, because Hiyama as the party paying the purchase price for the property would be considered the owner of the beneficial or equitable interest in the property, it may reasonably be inferred that coverage would also exist under Covered Risk No. 1 on the ground that someone else owns an interest in the title to the property held in Rivera's name. Finally, because a resulting trust carries out the presumed or inferred intentions of the parties, just as the

21.

enforcement of a contract would do, and inasmuch as Hiyama's lawsuit is largely based on allegations of breach of an oral contract concerning title, coverage would also appear to exist under Covered Risk No. 2, since Hiyama was claiming rights affecting Rivera's title because of a contract.

Moreover, since the alleged circumstances giving rise to the resulting trust were all in place at or before the close of escrow, there is no concern that this was a situation arising after the date the policy issued. In any event, in an apparent departure from the usual limitation of title insurance to the conditions existing on or before the date the policy issued, the subject policy in this case expressly provided enhanced protection that Covered Risks Nos. 1–6 would be covered even if occurring *after* the policy date, as stated by Covered Risk No. 7.

Our standard of review is clear. Where facts alleged in the complaint or fairly inferable from the same, or otherwise known by the insurer, suggest a claim *potentially* covered by the policy, the insurer's duty to defend arises. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.*, *supra*, 59 Cal.4th 277, 287.) Doubts as to whether an insurer owes a duty to defend must be resolved in favor of the insured. (*Ibid.*) Moreover, to protect the interests of the insured, coverage provisions are interpreted broadly. (*Medina v. GEICO Indemnity Co.*, *supra*, 8 Cal.App.5th 251, 259.) Applying these principles, we conclude for the reasons explained hereinabove that the claim for resulting trust alleged in Hiyama's lawsuit against Rivera was potentially within the scope of the policy's coverage provisions; thus, unless coverage was otherwise barred by the policy's exclusions, a duty to defend would exist.

In so concluding, it is necessary to address the principal ground for Fidelity's contention that Hiyama's lawsuit did not come within the policy's coverage provisions. Fidelity's argument is that this case is analogous to—and should follow—precedent holding there is no coverage for claims which are based on the insured's own tortious conduct relating to the manner in which he or she acquired title. The primary case relied

22.

on by Fidelity for this point is *Safeco*, *supra*, 116 Cal.App.3d 658. In *Safeco*, Moskopoulos was a real estate broker who negotiated with a couple to purchase their real property that was scheduled for a foreclosure sale. (*Id.* at pp. 661–662.) Moskopoulos believed an oral agreement had been reached for him to purchase the property on certain terms, but the sellers thereafter counteroffered and then revoked the counteroffer. Moskopoulos immediately filed an action against them for specific performance and recorded a lis pendens with respect to the subject property. When Moskopoulos did this, he was aware of the upcoming foreclosure sale and that the lis pendens would likely prevent the sellers from being able to sell the property to anyone else or to obtain refinancing. (*Id.* at pp. 662–663.) Moskopoulos's plan appeared to work, as the sellers settled with Moskopoulos and sold the property to him. (*Id.* at p. 663.) Afterwards, however, the sellers filed a lawsuit against Moskopoulos based on the events leading up to his purchase of the subject property. The sellers' lawsuit alleged causes of action for interference with contract, fraud, imposition of a constructive trust on the real property, and a rescission of the sale, among others, essentially seeking to undo the sale and regain title to the property due to Moskopoulos's tortious conduct. (*Ibid.*) Moskopoulos tendered defense of the sellers' lawsuit to Safeco Title Insurance Company under his title insurance policy. Safeco initially agreed to defend him subject to a reservation of rights, but then interposed an action for declaratory relief asserting that it had no duty to defend him in the sellers' action. (*Ibid.*)

The issue of duty to defend was eventually reviewed on appeal, and the Court of Appeal concluded that Safeco had no duty to defend since the sellers' lawsuit did not come within the coverage provisions of the policy. (*Safeco*, *supra*, 116 Cal.App.3d at p. 663.)[4] Moskopoulos argued the causes of action for rescission of the contract of sale

---

[4] *Safeco* also held that *even if* the sellers' lawsuit arguably came within the insuring or coverage provisions, it would be excluded from coverage under the policy's express

23.

and to have a constructive trust imposed on the property were adverse claims constituting defects in his title. The Court of Appeal disagreed, holding that the sellers' action was based on wrongful or tortious conduct relating to "the manner in which [Moskopoulos] acquired title," but did not indicate or reflect any defect in the title itself. (*Safeco*, *supra*, 116 Cal.App.3d at p. 665.) That is, the sellers' action alleged "intentionally tortious conduct by [Moskopoulos], not a defect in his title." (*Id*. at p. 666; accord, *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*, *supra*, 217 Cal.App.4th at pp. 80, 81 [following *Safeco* and holding the insuring clause did not cover the third-party action in that case because the action "did not allege a defect in Liberty's title, but tortious conduct in the manner in which Liberty acquired title"].)

In concluding there was no potential for coverage under the insuring clause, the Court of Appeal in *Safeco* further reasoned that if the sellers' lawsuit could constitute a defect in the title, "a title company insuring a buyer of real property under a standard form title policy such as the Safeco policy, *notwithstanding an otherwise impeccable title*, would have a potential liability to defend the insured in any third party action brought against the insured seeking rescission of the sale on any ground set forth in Civil Code section 1689, subdivision (b), or seeking to impress a constructive trust on the real property for the benefit of another, unless eliminated from coverage by the exclusionary clause. No reasonable construction of the policy could yield that result, nor could the insured reasonably expect the insurer to provide a defense under those circumstances." (*Safeco*, *supra*, 116 Cal.App.3d at pp. 665–666, italics added, fns. omitted.)

Having considered the holding and rationale of *Safeco*, as summarized above, we reject Fidelity's argument that it is applicable here. Rather, we conclude that *Safeco* is distinguishable from the present case because of the effect of the resulting trust cause of

exclusions due to Moskopoulos's own wrongful conduct creating the risk. (*Safeco*, *supra*, 116 Cal.App.3d at pp. 667–668.)

24.

action here, which cause of action was not present in *Safeco*. A resulting trust cause of action does not seek to rescind or undo a transaction due to a party's tortious conduct in regard to the manner of acquiring title, nor does it seek to rectify a fraud or other wrongdoing in connection therewith, but rather the trust is simply presumed to exist under the given set of facts—facts which in this case were clear and apparent at or before the close of escrow.[5] As we have repeatedly emphasized in this opinion, "[w]hen a transfer of real property is made to one person, and the consideration therefor is paid by or for another, *a trust is presumed to result* in favor of the person by or for whom such payment is made." (*In re Marriage of Ruelas*, *supra*, 154 Cal.App.4th 339, 342, italics added.) In that situation, the resulting trust arises "by operation of law" from such circumstances to carry out the presumed intentions of the parties. (*Fidelity National Title Ins. Co. v. Schroeder*, *supra*, 179 Cal.App.4th at p. 848.) These unique attributes of the resulting trust cause of action distinguish the present case from that of *Safeco*. Unlike *Safeco*, the situation here was that of a resulting trust that would arise by operation of law under the alleged facts and circumstances that existed at or before the close of escrow, and therefore which would have potentially impacted Rivera's title or ownership at the time the policy issued.

There is one exception to our conclusion that *Safeco* is distinguishable—namely, the promissory fraud claim set forth in Hiyama's lawsuit. To the extent Hiyama's lawsuit alleged that Rivera committed promissory fraud in seeking to get her name alone on the

---

[5] We note that following the trial on the merits below, the trial court found a resulting trust was created on April 2, 2013, shortly before escrow closed. In so finding, the trial court stated in its statement of decision: "To the extent Rivera held title to the Property as of the close of escrow, her title was defective. While record title indicated that [Rivera] alone held an interest in and to the Property, in reality Hiyama owned an interest in and to that title. Hiyama's interest was open and apparent as of the close of escrow. He funded the purchase of the Property but signed an agreement providing for Rivera's name to be on title. Given the standard of law, a resulting trust was created and apparent."

title, such a claim *would* entail tortious or fraudulent conduct relating to the manner in which she acquired title. Therefore, although Covered Risk No. 10 indicates that a covered risk under the policy generally includes claims affecting the insured's title because of fraud, we agree with *Safeco* that a distinction must reasonably be drawn where the claim is based on the insured's own tortious conduct in the manner of acquiring the property. That is so because such a claim involves intentionally tortious conduct by the insured, *not a defect in his title*, and manifestly presents a circumstance in which the insured could not reasonably expect the insurer to provide a defense. (*Safeco*, *supra*, 116 Cal.App.3d at p. 666.) For these reasons, we agree with Fidelity that the fraud-based claims in Hiyama's lawsuit are not within the coverage provisions of the policy.

In summary, with the exception of the fraud-based claims noted above, we hold that *Safeco* is distinguishable. Therefore, for the reasons discussed herein regarding the resulting trust cause of action, we conclude that Hiyama's lawsuit included a claim or cause of action that was at least potentially within the scope of the policy's coverage provisions. Since that is so, we must next consider whether coverage would be excluded under the policy's exclusionary provisions.

### 2. Hiyama's Lawsuit Was Clearly Excluded from Coverage

Of course, an insurance company may limit or exclude coverage of a policy issued by it. "When it has done so, the plain language of the limitation must be respected." (*Safeco*, *supra*, 116 Cal.App.3d at p. 666.) Fidelity maintains that even if Hiyama's lawsuit came within the policy's coverage provisions, there was still no duty to defend because coverage under the policy was clearly and expressly *excluded* under an exclusionary provision of the policy. In that regard, paragraph 4.a. of the policy excludes the following matters from coverage: "4. Risks: [¶] a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records." Additionally, paragraph 4.b. also excludes risks "that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date." As more fully

26.

explained below, we agree with Fidelity that the lawsuit came within the exclusion from coverage under paragraph 4.a. for risks that are "created, allowed, or agreed to" by the insured.

It has been held that the term " 'created,' " as used in this type of exclusion, means " 'conscious, deliberate causation' " in contrast to a result that was merely inadvertent or negligent. (*Safeco*, *supra*, 116 Cal.App.3d at p. 667; accord, *RNT Holdings, LLC v. United General Title Ins. Co.*, *supra*, 230 Cal.App.4th at p. 1301.) As is clear from the plain wording of paragraph 4.a. of the subject policy, risks that are of the insured's own making, because the situation or condition affecting title was deliberately created, allowed or agreed to by the insured, are excluded from coverage. That is precisely what occurred here. Consistent with the allegations of Hiyama's lawsuit, the undisputed factual matters in support of Fidelity's motion for summary judgment showed that Rivera executed the addendum to the escrow instructions, thereby intentionally agreeing to take title in her own name although the purchase price for the property was paid solely by Hiyama. Because Rivera deliberately agreed to this arrangement which, as a matter of law, brought about the risk of a defect to her title or ownership under resulting trust principles, we conclude that the exclusion set forth in paragraph 4.a. applied and defeated coverage in this case.

This conclusion is true not only of the resulting trust and contract-based claims within Hiyama's lawsuit, but also of the claims premised on promissory fraud therein. In the latter case, the alleged facts indicating Rivera's deliberate (i.e., not inadvertent) conduct creating or agreeing to the arrangement affecting the state of her title would be substantially the same. The only difference as to the fraud-based claims would be that the degree of her involvement would be further exacerbated by her alleged deceit. Either way, and regardless of the particular theory under consideration, we conclude the exclusion under paragraph 4.a. clearly applies to the entirety of Hiyama's lawsuit.

E.  Rivera's Cross-complaint Against Fidelity Without Merit

Due in large part to the exclusion from coverage regarding risks created, allowed or agreed to by the insured, we have decided in this opinion that there was no potential for coverage of Hiyama's lawsuit under the policy, and therefore no duty to defend.  This conclusion defeats both of Rivera's causes of action against Fidelity set forth in her cross-complaint as a matter of law, including for breach of insurance contract and for bad faith.  (See, e.g., *Hovannisian v. First American Title Ins. Co.*, *supra*, 14 Cal.App.5th at p. 437; *Havstad v. Fidelity National Title Ins. Co.*, *supra*, 58 Cal.App.4th 654, 661–662.)  It follows that the trial court correctly granted Fidelity's motion for summary judgment, even though its rationale differed in some respects from ours.  Consequently, the summary judgment must be affirmed.

## DISPOSITION

The order of the trial court granting summary judgment in favor of Fidelity on the cross-complaint is hereby affirmed.  Costs on appeal are awarded to Fidelity.


LEVY, J.

WE CONCUR:


HILL, P.J.


FRANSON, J.

28.